09-2732-cr (L)
United States v. James and Mallay

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: October 3, 2011; Final submission: July 16, 2012;[*]
Decided: March 28, 2013)

Docket Nos. 09-2732-cr (Lead), 09-2804-cr (Con)

------------------------------------

United States,

Appellee,

- v -

Richard James and Ronald Mallay,

Defendants-Appellants.

------------------------------------

Before:    SACK and RAGGI, Circuit Judges, and EATON, Judge.[**]

Appeal from judgments of the United States District Court for the Eastern District of New York (Sterling Johnson, Judge) convicting defendants on various counts of an indictment including murder, mail fraud, and murder in aid of racketeering, and imposing mandatory life sentences.  We find no error in the admission of an autopsy report and a toxicology report without the presence of the individuals who prepared those reports

---

[*]  The Court's consideration of this appeal was suspended pending the Supreme Court's decision in Williams v. Illinois, 132 S. Ct. 2221 (2012), and the parties' subsequent supplemental briefing directed to the significance, if any, of that decision here.

[**]  Judge Richard K. Eaton of the United States Court of International Trade, sitting by designation.

inasmuch as they were not testimonial statements because they were not made with the primary purpose of creating a record for use at a criminal trial, and therefore did not require that the defendants have the opportunity to confront the authors of the reports.  We further conclude that: there was no error in the district court's decision to exclude the prosecutor's rebuttal statement in a prior, related trial; the district court did not abuse its discretion in disallowing as impeachment evidence statements made by a cooperating witness outside of the jury's presence; the district court's denial of defendant Richard James's severance motion did not warrant vacatur of the verdict; there was no Sixth Amendment violation in the admission of surreptitious recordings made by a government informant; it was proper to admit that recording as a co-conspirator statement against defendant Mallay; there was no error in denying a motion for a new trial based upon post-trial allegations of prosecutorial misconduct; and there was no cumulative error warranting reversal.

Affirmed.  Judge Eaton concurs in a separate opinion.

JAMES G. McGOVERN, Susan Corkery, Robert L. Capers, for Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, New York, for Appellee.

STEVE ZISSOU, Esq., Bayside, New York, for Defendant-Appellant Richard James.

MICHAEL K. BACHRACH, Esq., New York, New York, for Defendant-Appellant Ronald Mallay.

2

SACK, Circuit Judge:

Richard James and Ronald Mallay appeal from judgments of conviction based on their participation in a wide-ranging conspiracy that involved fraudulently obtained life insurance policies for members of their extended families and others in the Guyanese and Guyanese-American community, and, in several instances, murder of the insured in order to collect on those policies.

**BACKGROUND**

After a jury trial in the United States District Court for the Eastern District of New York (Sterling Johnson, Judge), James and Mallay were each sentenced to mandatory terms of life in prison after they were convicted of racketeering, in violation of 18 U.S.C. § 1962(c); racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); mail fraud, in violation of 18 U.S.C. § 1341; conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371; and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). In addition, Mallay was convicted of murder for hire and conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958. James was also convicted of attempted murder for hire, in violation of 18 U.S.C. § 1958, and solicitation of murder in aid of racketeering, in violation of 18 U.S.C. §§ 373 and 1959(a)(1).

3

These charges revolved around the murders of four people: Vernon Peter, Alfred Gobin, Hardeo Sewnanan, and Basdeo Somaipersaud. While Mallay was charged in relation to all four murders, James was charged in connection with only the murders of Sewnanan and Somaipersaud. Mallay was convicted on every count with which he had been charged; James was convicted on all counts with which he had been charged, with the exception of those alleging conspiracy and murder for hire in connection with the deaths of Sewnanan and Somaipersaud. The defendants were eligible for the death penalty, but because the jury was unable to reach a unanimous verdict as to that punishment, a sentence of life imprisonment was imposed.

On appeal, the defendants do not contest the sufficiency of the evidence of insurance fraud. The issues on these appeals relate largely to the convictions of the defendants for committing four murders that were allegedly part of this scheme, and particularly the murders of Sewnanan and Somaipersaud, both of whom were poisoned to death. Accordingly, we review only that evidence necessary to explain our decision to affirm all counts of conviction.

Vernon Peter

In 1991, Mallay was convicted of theft from the postal service, for which he worked as a postal carrier, and sentenced to 15 months' imprisonment. See Memorandum & Order, United States v. James, No. 02 Cr 0778, 2009 WL 763612, at *1, 2009 U.S. Dist. LEXIS 23706, at *3 (E.D.N.Y. Mar. 18, 2009) ("James I").

4

While Mallay was incarcerated, his mother died of a heart attack. Id. Mallay blamed his arrest and conviction on his sister's husband, Vernon Peter, known as "Dilly." Id. He told his sister, Betty Peter, to keep Dilly's life insurance current because he planned to get even. Id., 2009 U.S. Dist. LEXIS 23706, at *4. In 1993, after Mallay was released from prison, he asked his nephew Baskinand Motillal if he would kill Dilly for Mallay. Id. at *2, 2009 U.S. Dist. LEXIS 23706, at *4. Motillal declined but introduced Mallay to another person, to whom Mallay paid $10,000 to commit the crime. He also gave that person $500 with which to purchase a weapon. Id. That person in turn recruited three others to help him carry out the murder. Id. On the morning of July 28, 1993, the four murdered Dilly as he walked out of his home. Id.

Betty Peter collected $400,000 on an insurance policy on Dilly's life. Id., 2009 U.S. Dist. LEXIS 23706, at *5. She then loaned at least $60,000 of those proceeds to Mallay.[1] Id., 2009 U.S. Dist. LEXIS 23706, at *5.

Alfred Gobin

In September 1993, Mallay met with James, then an insurance agent with MetLife, and Gulabie Gobin, Mallay's

---

[1] Betty Peter and Baskinand Motillal's trials were severed from James and Mallay's trial. Peter was convicted of charges including obstructing the investigation into the murder of her husband in aid of racketeering, and sentenced principally to 60 months' imprisonment. United States v. James, 322 F. App'x 32, 32-33 (2d Cir. 2009). Peter cooperated with the government subsequent to her conviction, and testified at the trial leading to the convictions appealed here. Id. at 35.

longtime mistress.  Id., 2009 U.S. Dist. LEXIS 23706, at *6. James and Mallay persuaded Gobin to take out two insurance policies on her father, Alfred Gobin, who was murdered in Guyana in January 1996.  Id.  Gulabie and her family received more than $200,000 from the policies, and lent James and Mallay nearly $60,000.  Id.

### Basdeo Somaipersaud

James encouraged a friend of his, Satyanand Arjun, to purchase an insurance policy on the life of Somaipersaud, a heavy drinker who sometimes lived with Arjun.  Id., 2009 U.S. Dist. LEXIS 23706, at *6-*7.  In October 1994, James obtained a $100,000 policy on Somaipersaud's life, with double indemnity if Somaipersaud died accidentally.  It named James's sister as a beneficiary.  Id.

During the fall of 1997, James offered $10,000 to Kenrick Hassan, a member of James's extended family, to kill Somaipersaud.  Id.  Although Hassan declined the offer, on January 23, 1998, Somaipersaud was found dead in a park in the Borough of Queens, New York City.  The New York City Office of the Chief Medical Examiner ("OCME") determined that Somaipersaud had died of acute alcoholism in combination with a dose of the drug chlorpromazine.[2]  Id.  James contacted Arjun to tell him of

---

[2]  Chlorpromazine [brand name: Thorazine] is used to "[t]reat[] mental disorders, severe behavior disorders, severe hiccups, severe nausea and vomiting, and certain types of porphyria. . . ."  See PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009582/?report=deta ils (last visited Mar. 22, 2013).

Somaipersaud's death, which Arjun found surprising because he was not aware of any connection between James and Somaipersaud and because he had not spoken to James since he had purchased the insurance policy.  Id.  James's girlfriend and Arjun received insurance payments as a result of Somaipersaud's death.  Id.

Hardeo Sewnanan

In October 1996, James arranged for the purchase of two $250,000 life insurance policies for Hardeo Sewnanan, who was Mallay's nephew, with Betty Peter, Mallay's wife, and Mallay's mistress's daughter named as beneficiaries.  Id., at *3, 2009 U.S. Dist. LEXIS 23706, at *8.  William Mallay, who shared an address with the defendant Ronald Mallay, paid the premiums on the policy.  Id.  In 1999, Ronald Mallay asked Kenrick Hassan to kill Sewnanan, who again declined to do so.  This time he put Mallay in touch with Kenrick's brother, Derick Hassan.  Id.  Mallay traveled to Guyana to meet with Derick, paying him $10,000 to kill Sewnanan.  But Derick Hasan ultimately decided not to do so.  Id.  Mallay later told Derick that he had hired others to commit the murder.  Id.

On January 8, 1999, Sewnanan died in Guyana of what the Guyanese medical examiner determined to be ammonia poisoning.  Id.; see also Memorandum & Order, United States v. James, No. 02 Cr 0778, 2007 WL 2702449, at *1, 2007 U.S. Dist. LEXIS 67538, at *2 (E.D.N.Y. Sept. 12, 2007) ("James II").  Mallay collected $400,000 on the policy on Sewnanan's life.  James I, 2009 WL 763612, at *3, 2009 U.S. Dist. LEXIS 23706, at *8.

7

## Appeals

The defendants raise eight separate issues on their appeals:  First, whether a new trial is required based on the district court's error under the Sixth Amendment's Confrontation Clause in admitting forensic reports relating to the deaths of Sewnanan and Somaipersaud -- specifically, the issues are whether one member of the OCME was properly allowed to testify regarding an autopsy conducted by another member of that office in which the witness had not participated, and whether a medical examiner from Guyana was properly allowed to testify to the results of toxicology tests which he had ordered but did not conduct; second, whether the district court erred in excluding the prosecution's statement in the prior criminal trial of Betty Peter, a cooperating witness in the current trial, suggesting greater culpability on her part for Vernon Peter's murder; third, whether the district court abused its discretion in refusing to permit the defendants to impeach Betty Peter's testimony with prior inconsistent statements; fourth, whether James is entitled to a new trial because the district court's refusal to order severance deprived him of a fair trial; fifth, whether the defendants had been deprived of a fair trial because of the district court's refusal to suppress statements elicited from James by a government informant after James's indictment; sixth, whether the district court erred in admitting, against Mallay as a coconspirator, recorded statements of James made surreptitiously by a third party; seventh, whether the district

court erred in denying a new trial based on allegations by a cooperating witness of prosecutorial misconduct and coercion; and eighth, whether there has been cumulative error sufficient to warrant a new trial.

**DISCUSSION**

**I.    The Confrontation Clause**

The defendants raise two separate Confrontation Clause issues on their appeals.  First, they contend that one member of the OCME could not constitutionally have been permitted to testify as to the results of Somaipersaud's autopsy, which was conducted by another member of that office.  Second, they urge that allowing the Guyanese medical examiner who conducted Sewnanan's autopsy to testify to the results of forensic tests conducted by a colleague ran afoul of the Confrontation Clause.

The Sixth Amendment provides, among other things, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.  The landscape of Confrontation Clause jurisprudence has changed considerably since the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004).  Even after Crawford, however, this court reaffirmed its settled holding that autopsy reports could be admitted as business records without violating the Confrontation Clause.  See United States v. Feliz, 467 F.3d 227, 230 (2d Cir. 2006).  Defendants urge us to reconsider this precedent in light of Supreme Court

9

decisions since Feliz limning the contours of what constitutes a "testimonial" statement in the context of a laboratory analysis. See Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). We conclude that even if these cases cast doubt on any categorical designation of certain forensic reports as admissible in all cases, the autopsy reports in this case are nevertheless not testimonial -- and therefore do not implicate the Confrontation Clause -- because they were not created "for the purpose of establishing or proving some fact at trial." Melendez-Diaz, 557 U.S. at 324; see also Bullcoming, 131 S. Ct. at 2719-20 (Sotomayor, J., concurring) ("When the 'primary purpose' of a statement is 'not to create a record for trial,' 'the admissibility of the statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" (quoting Bryant, 131 S. Ct. at 1155)).

A.    Confrontation Clause post-Crawford

In Crawford, the Court considered whether a tape-recorded statement to police made by the wife of a man being prosecuted for stabbing another man could be entered into evidence against the alleged perpetrator even though he had no opportunity to cross-examine the witness. She could not be compelled to testify against her husband under the state's marital privilege.

The Court's analysis relied heavily on the Confrontation Clause's historical background. The Court explained that the Confrontation Clause was designed to protect

10

against the "principal evil" of using ex parte statements against the accused.  Id. at 50.  Thus, the proper Confrontation Clause inquiry should focus not on reliability as contemplated by the law of evidence, but on the "witnesses against the accused - in other words, those who bear testimony." See id. at 51.  The Crawford Court determined that the statement at issue was "testimonial," having been made against an identified suspect while the witness herself was in police custody, and therefore either confrontation, or unavailability and a prior opportunity for cross-examination, was required.  Id. at 65-66.  But the Court "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial,'" to which its rule applied.  Id. at 68.  In any event, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.  These are the modern practices with the closest kinship to the abuses at which the Confrontation Clause was directed."[3]  Id.

---

[3]  Elsewhere in Crawford, the Court offered a more complete definition of "testimonial":

> Various formulations of this core class of "testimonial" statements exist: ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits,

11

In *Feliz*, we concluded, in light of *Crawford*, that "autopsy reports are not testimonial . . . and, thus, do not come within the ambit of the Confrontation Clause[.]" *Feliz*, 467 F.3d at 229. We examined a situation raising issues strikingly similar to those raised here -- one member of the OCME testified as to the findings of another member, and the testifying medical examiner had not participated in the autopsy at issue. *Id.* We remarked upon the sea change that *Crawford* brought about, but reasoned that it had "declined to 'spell out a comprehensive definition of 'testimonial.'" *Feliz*, 467 F.3d at 232 (quoting *Crawford*, 541 U.S. at 68). *Crawford*, we explained, "indicated that a statement produced through the 'involvement of government officers' and with an 'eye towards trial' is testimonial because it 'presents a unique potential for prosecutorial abuse -- a fact borne out time and again through a history with which the Framers were keenly familiar.'" *Feliz*, 467 F.3d at 232 (quoting *Crawford*, 541 U.S. at 56 n.7) (brackets omitted). We observed that among the classes of statements that *Crawford* concluded

> depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition -- for example, *ex parte* testimony at a preliminary hearing.

*Id.* at 51-52 (citations and internal quotation marks omitted).

12

would be testimonial were those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 233 (quoting Crawford, 467 F.3d at 52).

We concluded that autopsy reports would nonetheless be admissible as business records under Federal Rule of Evidence 803(6) because "a business record is fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence." Feliz, 467 F.3d at 233-34. Because the business records exception "requires business records to be kept in the regular course of a business activity, records created in anticipation of litigation do not fall within its definition." Id. at 234.

We rejected the argument that "autopsy reports must be testimonial because a medical examiner preparing such a report must have a reasonable expectation the reports may be available for use in a subsequent trial." Id. Because "the Supreme Court did not opt for an expansive definition [of testimonial] that depended on a declarant's expectations," we said, "we are hesitant to do so here." Id. at 236. We concluded that business records fell outside Crawford's definition of testimonial "even where the declarant is aware that it may be available for later use at trial," Feliz, 467 F.3d at 236, and that autopsy reports were business records within the meaning of Rule 803(6), as thousands of autopsies were conducted every year "without regard to the likelihood of their use at trial." Id. We further

13

concluded that autopsy reports would be equally admissible as public, rather than business, records because Rule 803(8)(A)-(B), which defines public records, excludes documents prepared in anticipation of litigation and matters observed by police officers. Id. at 237. "These factors suggest that public records, like business records, 'bear[] little resemblance to the civil-law abuses the Confrontation Clause targeted.'" Id. (quoting Crawford, 541 U.S. at 51).

In 2009, however, the Supreme Court cast doubt on our post-Crawford jurisprudence in this area. In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Court concluded that "certificates of analysis" identifying a seized substance as an illicit drug should not have been introduced against the defendant absent an opportunity for the defendant to confront the person who prepared the certificate. The Melendez-Diaz Court reached this conclusion in part because the certificates "are quite plainly affidavits: declarations of facts written down and sworn to by the declarant before an officer authorized to administer oaths." Id. at 310 (internal quotation marks omitted). "The 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" Id. at 310-11 (quoting Davis v. Washington, 547 U.S. 813, 830 (2006)). "We can safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose -- as stated in the relevant state-law provision -- was reprinted on the affidavits themselves."

14

Id. at 311.  The Court once again declined to spell out a comprehensive definition of testimonial.

The Melendez-Diaz Court rejected the government's argument that the evidence should be admitted because it was a business record -- the hearsay exception upon which we relied in Feliz -- because that exception had never applied "if the regularly conducted business activity is the production of evidence for use at trial."  Id. at 321.  The Court concluded:

> Business and public records are generally admissible absent confrontation, not because they qualify under an exception to the hearsay rules, but because -- having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial -- they are not testimonial.  Whether or not they qualify as business or official records, the analysts' statements here -- prepared specifically for use at petitioner's trial -- were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment.

Id. at 324.

Justice Kennedy, in dissent, criticized the majority for "disregard[ing] a century of jurisprudence" in favor of "formalistic and wooden rules, divorced from precedent, common sense, and the underlying purpose of the Clause."  Id. at 330-31 (Kennedy, J., dissenting).  In explaining why the analyst reports at issue did not implicate the Confrontation Clause, Justice Kennedy asserted:

> First, a conventional witness recalls events observed in the past, while an analyst's report contains near-contemporaneous observations of the test. . . .  Second, an

analyst observes neither the crime nor any human action related to it. . . .  The analyst's distance from the crime and the defendant, in both space and time, suggests the analyst is not a witness against the defendant in the conventional sense.  Third, a conventional witness responds to questions under interrogation. . . .  Put differently, out-of-court statements should only "require confrontation if they are produced by, or with the involvement of, adversarial government officials responsible for investigating or prosecuting crime."

Id. at 345-46 (quoting Carolyn Zabrycki, Comment, Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement, 96 Cal. L. Rev. 1093, 1118 (2008)).

In Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011), the question presented was whether a "certificate of analyst" containing the results of a blood-alcohol test administered pursuant to a DUI arrest required the testimony of the analyst who conducted the gas chromatograph test.  Id. at 2710-11.  The trial court had admitted the test as a business record, and allowed its introduction through the testimony of "an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification."  Id. at 2713.  The Court rejected the suggestion that the report was nontestimonial:

In all material respects, the laboratory report in this case resembles those in Melendez-Diaz.  Here, as in Melendez-Diaz, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations.  Like

the analysts in Melendez-Diaz, [the analyst] tested the evidence and prepared a certificate concerning the result of his analysis. Like the Melendez-Diaz certificate, [the certificate here] is "formalized" in a signed document. . . . In sum, the formalities attending the "report of blood alcohol analysis" are more than adequate to qualify [the analyst's] assertions as testimonial.

Id. at 2717 (citations omitted).

Justice Sotomayor concurred, relying largely on a Confrontation Clause opinion she had written earlier in the term in Michigan v. Bryant, 131 S. Ct. 1143 (2011) (concluding that statements made by a dying man to police could be admitted without requiring confrontation). "To determine if a statement is testimonial, we must decide whether it has 'a primary purpose of creating an out-of-court substitute for trial testimony.' When the 'primary purpose' of a statement is 'not to create a record for trial,' 'the admissibility of the statement is the concern of the state and federal rules of evidence, not the Confrontation Clause.'" Bullcoming, 131 S. Ct. at 2720 (Sotomayor, J., concurring) (quoting Bryant, 131 S. Ct. at 1155). Noting that Bullcoming was "not a case in which the State suggested an alternate purpose, much less an alternate primary purpose, for the BAC report," such as to provide for medical treatment, Justice Sotomayor concluded that the primary purpose "is clearly to serve as evidence" and its introduction without confrontation was therefore in error. Id. at 2722-23.

17

Last term, in Williams v. Illinois, 132 S. Ct. 2221 (2012), the Court returned to consideration of the Confrontation Clause, this time to determine whether it was a violation to allow an expert to testify in a rape case that "a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner's blood." Id. at 2227. The defendant argued that the expert "went astray when she referred to the DNA profile provided by Cellmark as having been produced from semen found on the victim's vaginal swabs," even though she did not conduct or observe any of the work that Cellmark had done in deducing a male DNA profile. Id. at 2227, 2230. The Court came to no clear consensus as to what constituted a testimonial statement in this context, however, issuing a plurality opinion, two concurrences, and a dissent.

The plurality opinion by Justice Alito, joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer -- the dissenters in Melendez-Diaz and Bullcoming -- concluded that the testimony did not run afoul of the Confrontation Clause using two separate paths. First, it noted that "[i]t has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts." Id. at 2233. Under the Illinois and federal rules, "an expert may base an opinion on facts that are 'made known to the expert at or before the hearing,'" even if those facts themselves are

18

inadmissible. Id. at 2234 (quoting Ill. R. Evid. 703; Fed. R. Evid. 703).

While in a jury trial the expert would be prohibited from disclosing those underlying facts, in a bench trial, such as that in Williams, the judge would be trusted to understand that those facts were not offered for their truth. Id. at 2234-35. The plurality concluded that "it is clear that the putatively offending phrase . . . was not admissible for the purpose of proving the truth of the matter asserted," and "there is no reason to think that the trier of fact took [the testimony] as substantive evidence to establish where the DNA profiles came from." Id. at 2237. Because other evidence also established the origin of the DNA profile, and because the trial judge was presumed not to have considered the evidence for its truth, the plurality concluded that there had been no Confrontation Clause violation. Id. at 2240. The plurality noted that in Bullcoming and Melendez-Diaz, "there is no question" but that the test results were offered for their truth, whereas in Williams, the report was offered "only for the distinctive and limited purpose of seeing whether it matched something else." Id. at 2240 (internal quotation marks omitted).

The plurality next considered whether, even if the testimony had been offered for its truth, there would have been no Confrontation Clause violation. "The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they

19

involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." Id. at 2242. The plurality asserted that "[t]he Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." Id. at 2228. The plurality concluded that the admission of the report did not run afoul of the Confrontation Clause because these purposes were not of the same type that the clause had been enacted to protect against. Id.

In a concurring opinion, Justice Breyer said that he would have set the case for reargument in order to answer the question of what constitutes a "testimonial statement" with regard to "the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians." Id. at 2244-45 (Breyer, J., concurring). He criticized the Court's evolving Confrontation Clause jurisprudence as offering "no logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the

prosecution to call all of the laboratory experts who did so." Id. at 2246 (emphasis in original).

Justice Breyer did not himself offer a comprehensive definition of testimonial, but said he would continue to adhere to the dissenting views in Bullcoming and Melendez-Diaz. "[T]he need for cross-examination is considerably diminished when the out-of-court statement was made by an accredited laboratory employee operating at a remove from the investigation in the ordinary course of professional work." Id. at 2249. Justice Breyer asserted that "to bar admission of the out-of-court records at issue here could undermine, not fortify, the accuracy of factfinding at a criminal trial," because it would potentially bar autopsy reports:

> Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial. Autopsies are typically conducted soon after death. And when, say, a victim's body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial? Is the Confrontation Clause effectively to function as a statute of limitations for murder?

Id. at 2251 (citations and internal quotation marks omitted).

Justice Breyer proposed as a solution a rebuttable presumption that DNA reports of the type at issue be admissible, with the defendant able to call the technician if he would choose to do so, or to require confrontation upon a showing of a reason to doubt the laboratory's competence or honesty. Id. at 2251-52.

Justice Thomas concurred only in the judgment, and, consistent with his prior opinions on the subject, did so because the Cellmark report "lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained." Id. at 2260 (Thomas, J., concurring in the judgment). Further, Justice Thomas explicitly rejected the plurality's requirement that the primary purpose of the statements concern a targeted individual, noting that "[t]here is no textual justification, however, for limiting the confrontation right to statements made after the accused's identity became known." Id. at 2262 (Thomas, J., concurring).

In dissent, Justice Kagan, joined by Justices Scalia, Ginsburg, and Sotomayor, characterized Williams as an "open-and-shut case": "The State of Illinois prosecuted Sandy Williams for rape based in part on a DNA profile created in Cellmark's laboratory. Yet the State did not give Williams a chance to question the analyst who produced that evidence." Id. at 2265 (Kagan, J., dissenting). Taking note of the fact that the judgment had been affirmed without a majority settling on a "reason why," Justice Kagan averred that "in all except its disposition, [Justice Alito's plurality] opinion is a dissent." Id. Likening the expert's testimony in Williams to the "surrogate testimony" in Bullcoming, Justice Kagan asked, "Have we not already decided this case?" Id. at 2267.

22

Justice Kagan's opinion roundly rejected the idea that the expert's testimony had not been offered for its truth, noting recent scholarship and case law suggesting that the entire concept of "basis evidence" is illusory. "[A]dmission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it except assess its truth and so the credibility of the conclusion it serves to buttress." Id. at 2269 (emphasis in original).

Justice Kagan then turned to the plurality's conclusion that the DNA report was nontestimonial, joining Justice Thomas's criticism of the reformulated primary purpose test as having no basis in constitutional text, history, or the Court's prior precedents. "We have previously asked whether a statement was made for the primary purpose of establishing past events potentially relevant to later criminal prosecution -- in other words, for the purpose of providing evidence. None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual." Id. at 2273-74.

The dissenters also rejected the plurality's suggestion that the purpose of the DNA testing was "to respond to an ongoing emergency, rather than to create evidence for trial," id. at 2274 (internal quotation marks omitted), noting that the expert herself had testified that the DNA report was conducted "'for this criminal investigation . . . and for the purpose of the eventual litigation' -- in other words, for the purpose of

producing evidence, not enabling emergency responders."  Id. (citation omitted).

Summarizing the current state of Confrontation Clause jurisprudence, Justice Kagan noted that the five Justices who agreed on the judgment "agree on very little," and "have left significant confusion in their wake."  Id. at 2277.

> What comes out of four Justices' desire to limit Melendez-Diaz and Bullcoming in whatever way possible, combined with one Justice's one-justice view of those holdings, is -- to be frank -- who knows what.  Those decisions apparently no longer mean all that they say.  Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority.

Id.

B.  Controlling Law

We are confronted in this case with the puzzle Justice Kagan described: Which of the foregoing principles enunciated by various members of the Supreme Court controls here?

We begin by looking to our holding in Feliz -- a case decided on facts very similar to these -- to determine how and to what extent the Supreme Court's intervening decisions have altered the rule we established in that case.  There, we concluded that autopsy reports were nontestimonial based in large part on their status as business records.  Feliz, 467 F.3d at 236.  But, as we have explained, Melendez-Diaz and Bullcoming, and to a lesser extent Williams, call this categorical conclusion into doubt.

24

In each of these cases, the records were, in some sense, business records -- all were made in the course of the regular business that the laboratory in question conducts: forensic testing.  Yet, in <u>Melendez-Diaz</u> and <u>Bullcoming</u>, the Supreme Court concluded that the results of the tests were testimonial because they were completed "for the purpose of establishing or proving some fact at trial," <u>Melendez-Diaz</u>, 557 U.S. at 324, or were "affirmations made for the purpose of establishing or proving some fact in a criminal proceeding," <u>Bullcoming</u>, 131 S. Ct. at 2716 (internal quotation marks omitted).[4]  As the <u>Melendez-Diaz</u> Court explained, "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because -- having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial -- they are not testimonial."  557 U.S. at 324.  The reports at issue in that case, having been "prepared specifically for use at . . . trial[,]" were testimonial "[w]hether or not they qualif[ied] as business or official records."  <u>Id.</u>

---

[4]  No conclusion was reached in <u>Feliz</u> as to whether the autopsy reports were similarly completed for the purpose of establishing a fact at trial, in part because we did not then think that "the reasonable expectation of the declarant should be what distinguishes testimonial from nontestimonial statements," <u>Feliz</u>, 467 F.3d at 235, rendering that factual inquiry unnecessary.

We distill from this pre-Williams case law the principle that a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial. See Melendez-Diaz, 557 U.S. at 324; Bryant, 131 S. Ct. at 1155-56 (explaining application of the primary purpose standard); see also Bullcoming, 131 S. Ct. at 2720 (Sotomayor, J., concurring) ("To determine if a statement is testimonial, we must decide whether it has 'a primary purpose of creating an out-of-court substitute for trial testimony.' When the 'primary purpose' of a statement is 'not to create a record for trial,' 'the admissibility of the statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" (quoting Bryant, 131 S. Ct. at 1155)).

The question then becomes whether the Court's later decision in Williams changed that rule. We agree with Justice Kagan that this problem is intractable. No single rationale disposing of the Williams case enjoys the support of a majority of the Justices. Ordinarily, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430

U.S. 188, 193 (1977) (internal quotation marks omitted).  But what is the narrowest ground in the disposition in Williams?

The Williams plurality's first rationale -- that the laboratory report there was offered as basis evidence, and not for its truth -- was roundly rejected by five Justices. Williams, 132 S. Ct. at 2258-59 (Thomas, J., concurring in the judgment); Id. at 2268-69 (Kagan, J., dissenting).  In any event, we are hard-pressed to read this rationale as controlling this case because the facts before us are in significant respects different from those presented in Williams.[5]

Nor do we think we can apply the plurality's narrowed definition of testimonial, which would require that the analyst had "the primary purpose of accusing a targeted individual of engaging in criminal conduct[.]"  Id. at 2242.  Again, five Justices disagreed with this rationale, and it would appear to conflict directly with Melendez-Diaz, which rejected a related

_____

[5]  For example, Corinne Ambrosi, the OCME's deputy chief medical examiner for Queens County, testified in order to establish Somaipersaud's cause of death, which was not at all obvious and was clearly relevant to the charges against the defendants.  No other testimony established that Somaipersaud died of poisoning.  By contrast, in Williams, other admissible evidence established that the sample tested by Cellmark came from the victim's vaginal swab.  See Williams, 132 S. Ct. at 2239.

Also, the plurality in Williams relied at least in part on the fact that Williams was a bench trial, noting that the "[t]he dissent's argument would have force if petitioner had elected to have a jury trial."  Williams, 132 S. Ct. at 2236. The case before us was tried to a jury, leaving us less confident that the factfinder would understand the conceptual distinction between basis evidence and evidence offered for its truth.

argument. See Williams, 132 S. Ct. at 2274 (Kagan, J., dissenting). For similar reasons -- lack of support among the Justices and conflict with prior precedents that did command majority support -- we do not think either Justice Thomas's concurrence on the ground that the analysis was not sufficiently "formalized," or Justice Breyer's new approach to application of the Confrontation Clause, is controlling.

Williams does not, as far as we can determine, using the Marks analytic approach, yield a single, useful holding relevant to the case before us. It is therefore for our purposes confined to the particular set of facts presented in that case. We think it sufficient to conclude that we must rely on Supreme Court precedent before Williams to the effect that a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial.[7] See Melendez-Diaz, 557 U.S. at 310-11; Bryant, 131 S. Ct. at 1155; see also Bullcoming, 131 S. Ct. at 2716; Davis v. Washington, 547 U.S. 813, 822 (2006); Crawford, 541 U.S. at 51-52.

---

[7] Although the law is not well developed in the area of testimonial versus nontestimonial statements, a close analogue may be found in cases examining the applicability of the attorney work-product privilege, which applies when documents are created by an attorney "in anticipation of litigation." See, e.g., Matter of Grand Jury Subpoenas Dated Oct. 22, 1991 and Nov. 1, 1991, 959 F.2d 1158, 1166 (2d Cir. 1992).

We address first the defendants' argument that allowing surrogate testimony concerning the autopsy report in Somaipersaud's death was error.  This purported error was not objected to at trial.  We review challenges on appeal that the defendants did not raise at trial for plain error.  A finding of "plain error" requires that

> (1) there is an error; (2) the error is plain, that is, the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

United States v. Marcus, 628 F.3d 36, 42 (2d Cir. 2010) (internal quotation marks and bracket omitted).

1. Testimony at trial.  Corinne Ambrosi, the OCME's deputy chief medical examiner for Queens County, testified at trial regarding Somaipersaud's death.  She explained that the OCME generally performs autopsies "where people died in unexpected circumstances, unnatural deaths, unexpected deaths.  Those come to the attention of the medical examiner."  Trial Tr. 4655:18-20.  Ambrosi had previously testified as an expert witness on cause and manner of death 106 times.  She testified that she did not perform or participate in Somaipersaud's autopsy, which was conducted by Dr. Heda Jindrak, who at the time of trial was no longer employed by the OCME.  Ambrosi described

at length the results of toxicology tests ordered by Jindrak, which informed the autopsy report. These tests were performed by technicians at the OCME's main office in Manhattan. Ambrosi explained that the tests showed that Somaipersaud had elevated levels of alcohol as well as chlorpromazine, which is sometimes used as an antipsychotic drug. She offered her own opinion that the level of alcohol revealed by the tests would not alone have been enough to have killed Somaipersaud. She testified that the chlorpromazine levels were, however, significant -- more than she would have expected to see from someone regularly taking the drug as medication for a psychiatric illness. Ambrosi further testified that the level of chlorpromazine detected in the victim's body combined with the level of blood alcohol in the body would have been enough to have killed the victim, and that the combination had indeed been determined to be the cause of Somaipersaud's death.

The toxicology report was admitted as an exhibit at trial. It indicated .26 blood alcohol content and 1.9 milligrams per kilogram chlorpromazine levels. Ambrosi explained that the chlorpromazine levels appeared to be acute because the level in the liver was 75.7 milligrams per kilogram, whereas in someone who was prescribed the drug therapeutically it would not normally be more than 10 milligrams per kilogram. Ambrosi further explained that she did not recall ever having seen levels of chlorpromazine in a person that high. She also testified as to Jindrak's autopsy determination that the cause of death was

30

"[a]cute intoxication by the ethynel or alcohol and chlorpromazine," and that she agreed with that assessment. Trial Tr. 4678:20-21. "[H]ypertensive and arteriosclerotic cardiovascular disease" were also contributing factors. Trial Tr. 4679:2-3.

On cross-examination, Ambrosi confirmed that she had not participated in the autopsy. Her testimony was based on her review of the case file before testifying.

2. Analysis. To resolve this case we must determine whether, under the circumstances, the autopsy report (including the toxicology report) was prepared with the primary purpose of creating a record for use at a later criminal trial.[8] As we

---

[8] It is worth noting that courts throughout the country have applied various approaches and reached differing conclusions when considering Confrontation Clause challenges to the introduction of autopsy reports. Compare United States v. Moore, 651 F.3d 30, 73 (D.C. Cir. 2011)(concluding that Chief Medical Examiner's surrogate testimony on autopsy reports prepared by others violated the Confrontation Clause where law enforcement officers observed the autopsies and participated in the creation of the reports -- circumstances that "would have signaled to the medical examiner that the autopsy might bear on a criminal investigation" -- and each autopsy "found the manner of death to be a homicide caused by gunshot wounds") with State v. Locklear, 363 N.C. 438, 452, 681 S.E.2d 293, 305 (2009)("Thus, when the State seeks to introduce [autopsy reports], absent a showing that the analysts are unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them such evidence is inadmissible under Crawford."(quotation marks, citation, and brackets omitted)).

There is also academic debate on the subject. Compare Zabrycki, supra, cited by the Supreme Court in both Melendez-Diaz and Williams, in which the author proposed a definition of testimonial similar to that endorsed by the Williams plurality, proposing that "out-of-court statements are testimonial and thus require confrontation if they are produced by, or with the involvement of, adversarial government officials responsible for

31

explained in United States v. Burden, 600 F.3d 204 (2d Cir. 2010), the examples of testimonial statements outlined in Crawford, are not "more than a set of guideposts [for] courts [to] work through, case-by-case . . . . [N]o court can say whether a particular kind of statement is testimonial until it has considered that kind of statement in an actual case." Id. at 224.

Key to determining the resolution of the case before us is the particular relationship between the OCME and law enforcement both generally and in this particular case. While the OCME is an independent agency,[9] the police are required to notify it when someone has died "from criminal violence, by

investigating and prosecuting crime," 96 CAL. L. REV. 96 CAL. L. REV. 1118, but arguing that medical examiners are "public health officials," rather than law enforcement officers, and therefore, unless the medical examiner "writes an autopsy report in response to police interrogation," the report is non-testimonial, id. at 1128-29, with Professor Richard Friedman, who argued in a petition for writ of certiorari from a decision of the Supreme Court of Ohio, State v. Craig, 110 Ohio St.3d 306, 853 N.E.2d 621 (2006), cert. denied, 549 U.S. 1255 (2007), that while "[t]here are, of course, situations in which coroners write autopsy reports without anticipation that they will likely be used in forensic proceedings, and for other purposes . . . ," id. at *13-*14, "where, as here, the coroner concludes that the decedent was clearly a victim of homicide, there can be no genuine doubt that a reasonable person in the position of the coroner understands that there will be forensic proceedings and intends that the report will be used in them," id. at *14, and they are therefore testimonial.

[9] See People v. Freycinet, 11 N.Y.3d 38, 42, 862 N.Y.S.2d 450, 453 (2008) (concluding than an autopsy report was not testimonial, in part because the OCME is "by law, independent of and not subject to the control of the office of the prosecutor" and "not a law enforcement agency" (internal quotation marks omitted)); People v. Hall, 84 A.D.3d 79, 83, 923 N.Y.S.2d 428, 431 (1st Dep't 2011).

32

accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner or where an application is made pursuant to law for a permit to cremate a body of a person." N.Y.C. Charter § 557(a),(f)(1); see also N.Y.C. Admin Code § 17-202. The OCME is required to "take charge of the dead body" in such instances, and must "fully investigate the essential facts concerning the circumstances of the death" and interview witnesses and collect evidence that "may be useful in establishing the cause of death." N.Y.C. Admin. Code § 17-202(a).

It is the OCME that determines whether to conduct an autopsy based on whether "it may be concluded with reasonable certainty that death occurred from natural causes or obvious traumatic injury[.]" N.Y.C. Admin Code § 17-203. Whenever an autopsy is deemed necessary, it "shall include toxicologic, histologic, microbiologic and serologic examinations," the results of which must be written down and filed with the OCME, regardless of whether any further investigation results. Id. "Such medical examiner, medical investigator or lay medical investigator shall take possession of any portable objects which, in his or her opinion, may be useful in establishing the cause of death, and except as provided in subdivision c hereof [relating

to suicide notes], shall deliver them to the police department."[10]  Id. § 202(a).

Because the defendants failed to object to the introduction of Ambrosi's testimony during trial, there is scant record of the circumstances under which Jindrak produced her autopsy report.  In its written ruling on the defendants' objections to the testimony of Dr. Vivikand Brijmohan -- whose testimony on the cause of death of another victim, Sewnanan, is

---

[10]  We similarly explained in United States v. Rosa, 11 F.3d 315 (2d Cir. 1993), that

> the Medical Examiner's Office is required simply to investigate unnatural deaths; it refers a death bearing any indicium of criminality to the appropriate district attorney and has no responsibility for enforcing any laws.  The chief medical examiner and his assistants are required to be physicians and pathologists; there is no requirement in the Charter that they be attorneys or that any employees of the office have any law enforcement training.  Even when a matter is referred to the district attorney because of an indication of criminality, the Charter does not give the medical examiner any responsibility for collecting evidence or determining the identity of the perpetrator.  Further, though law enforcement activities are typically accusatory and adversarial in nature, a medical examiner's reported observations as to a body's condition are normally made as part of an independent effort to determine a cause of death.  Indeed, "a medical examiner, although often called a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case."

Id. at 332 (2d Cir. 1993)(citation omitted) (quoting Manocchio v. Moran, 919 F.2d 770, 777 (1st Cir. 1990) (internal quotation marks omitted)).

discussed below -- the district court noted that "Jindrak conducted an internal and external examination as well as a toxicology analysis," and that Ambrosi described these steps as "routine." James II, 2007 WL 2702449, at *2 n.1. The defendants do not argue in either of their briefs, or in the supplemental letter briefs submitted in response to the request by this Court after Williams, that Somaipersaud's autopsy was anything other than routine -- there is no suggestion that Jindrak or anyone else involved in this autopsy process suspected that Somaipersaud had been murdered and that the medical examiner's report would be used at a criminal trial. Ambrosi testified that causes of death are often undetermined in cases like this because it could have been a recreational drug overdose or a suicide. The autopsy report itself refers to the cause of death as "undetermined" and attributes it both to "acute mixed intoxication with alcohol and chlorpromazine" combined with "hypertensive and arteriosclerotic cardiovascular disease."

The autopsy was completed on January 24, 1998, and the report was signed June 16, 1998, substantially before any criminal investigation into Somaipersaud's death had begun. During the course of Ambrosi's lengthy trial testimony, neither the government nor defense counsel elicited any information suggesting that law enforcement was ever notified that Somaipersaud's death was suspicious, or that any medical examiner expected a criminal investigation to result from it. Indeed,

35

there is reason to believe that none is pursued in the case of most autopsies.[11]

In short, the autopsy report was not testimonial because it was not prepared primarily to create a record for use at a criminal trial.[12]  There was therefore no error, much less plain error, in admitting the autopsy report into evidence, or allowing Ambrosi to testify regarding it, although she did not conduct it herself.

D.  Testimony Related to Sewnanan's Death

In contrast to Ambrosi's testimony relating to Somaipersaud's death, the defendants vigorously objected to Dr. Vivikand Brijmohan's testimony as to a toxicology test relating

---

[11]  The OCME performs an average of 5,500 autopsies each year, and in 2010, for example, 533 New York City residents' causes of death were listed as homicides.  See OCME, General Information Booklet, http://www.nyc.gov/html/ocme/downloads/pdf/General%20Information/OCME%20General%20Information%20Booklet.pdf (last visited Mar. 22, 2013); Deaths and Death Rates by Selected Causes New York City - 2010, http://www.health.ny.gov/statistics/vital_statistics/2010/table33c.htm (last visited Mar. 22, 2013).  This suggests, although the data is of course insufficient to demonstrate conclusively, that something in the order of ten percent of deaths investigated by the OCME lead to criminal investigations.  The statistics from Los Angeles tell a similar story: "In 2004, the Los Angeles Medical Examiner's office conducted 4,180 complete autopsies out of 9,465 cases taken by the office.  Of the 9,465 total cases, 1,121 died from homicide, 709 from suicide, 3,090 from accidents, and 4,256 from natural causes." Zabrycki, 96 Cal. L. Rev. at 1125.

[12]  No contrary conclusion is warranted by United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012).  Although that case holds that "[f]orensic reports constitute testimonial evidence," id. at 1230, the decision was based in part on the fact that the Florida Medical Examiner's Office "was created and exists within the Department of Law Enforcement," id. at 1231.  Here, the OCME is a wholly independent office.

to the death of Hardeo Sewnanan, which was based on forensic testing conducted by Dr. Leslie Mootoo.  When analyzing error that the defendants did raise at trial, we review for harmlessness, which requires us to ask whether we are satisfied "upon a review of the entire record . . . beyond a reasonable doubt that the error complained of . . . did not contribute to the verdict obtained."  United States v. Lee, 549 F.3d 84, 90 (2d Cir. 2008) (internal quotation marks omitted).  "In other words, to find the [error] harmless we must be able to conclude that the evidence would have been unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record."  Id. (internal quotation marks and citations omitted).  We consider "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; (4) whether such evidence was cumulative of other properly admitted evidence."  Id. (internal quotation marks omitted).

1. Testimony at trial.  Brijmohan testified regarding Sewnanan's cause of death, in part based on toxicology tests conducted by Mootoo, who had died between his performance of the test and the time of trial.  Brijmohan was the chief forensic pathologist for the region of Guyana where Sewnanan's death occurred.  Brijmohan testified that he would normally be informed of the need for an autopsy by a coroner affiliated with the police department.  Typically, autopsies in Guyana are performed

37

when there are "unnatural deaths," i.e., "accidents, murders, strangulations, drowning, . . . and of course including cases of poisoning." Trial Tr. 3266:12-17. Brijmohan explained that in conducting Sewnanan's internal examination, he discovered "extensive submucosal hemorrhages," which "is not definitely a normal finding. Whenever such a finding occurs, one immediately thinks of extraneous ingestion and one thinks definitely of poisoning." Trial Tr. 3265:13-14, 22-24.

Brijmohan then sent the post-mortem contents of Sewnanan's stomach for toxicology testing. He testified that the contents were taken by a police officer to the Guyanese police laboratory, the stamp of which appeared on the resultant toxicology report. Brijmohan further testified that he did not know who actually performed the toxicology test. While Dr. Mootoo may have played some role in the testing, Brijmohan was apparently not sure whether Mootoo had conducted the testing himself.

Brijmohan testified, based on "the scientific evidence of my examination and the toxicology report, that the cause of death of Hardeo Sewnanan was the consequence of the ingestion of a toxic substance with ammoniacal compound." Trial Tr. 3299:7-10. Brijmohan said it was probably hydrocyanic acid, or potassium and sodium cyanide, in which case there would have been no symptoms prior to death. Brijmohan further testified that the toxicology report indicated death resulted from ammonia poisoning

38

and, over continued objections, explained that the toxicology report on Sewnanan's stomach indicated ammonia poisoning.[13]

On cross-examination, Brijmohan was questioned extensively as to whether the ammonia found in Sewnanan's body could have been naturally occurring, inasmuch as ammonia often occurs naturally in the human body after death. Brijmohan testified that his knowledge that it was commercially produced was based on the laboratory report. His conclusion that Sewnanan died of commercially-produced ammonia "was based essentially on my observation of the stomach, with the hemorrhages, the laboratory reports that was brought to my attention." Trial Tr. 3382:23-25.

2. The district court's decision. The district court rejected the defendants' argument that allowing introduction of the toxicology report into evidence would violate the Confrontation Clause. See Mem. & Order, United States v. James, 2007 WL 2792449, at *1, 2007 U.S. Dist. LEXIS 39585, at *3-*4 (E.D.N.Y. May 31, 2007). The district court relied on Feliz in allowing introduction of the report, but its decision preceded the Supreme Court decisions in Bullcoming, Melendez-Diaz, and Williams.

---

[13] Over repeated objections, Brijmohan testified that test results from two bottles sent to the police lab, one of which tested positive for ammonia, informed his analysis. The record does not conclusively reveal whether the contents of the bottles derived from the victim's body – though that appears the logical inference.

39

The district court did base its decision, however, in large part on its conclusion that the toxicology report was not a "'chemist's' report created by 'law enforcement.'" Id. at *2. While acknowledging that the defendants had described the "close proximity" between the medical examiner's office and the Guyanese police station, and the cooperation between those two agencies, the court concluded that "the critical inquiry is not the physical proximity of two agencies, or their level of cooperation, but rather whether the agency that created the report can be characterized by its duties and purposes as law enforcement." Id. The district court cited Rosa's dictum to the effect that the OCME is not a law enforcement agency, and then, noting that the Guyanese medical examiner operates as part of the Guyanese Ministry of Health and Georgetown Hospital, observed that "[t]here is no indication that Dr. Mootoo was employed by a law enforcement agency or was responsible for enforcing any laws. . . . [I]t appears that the Guyanese Office of Forensic Medicine, for which Drs. Brijmohan and Mootoo worked, is directly analogous to the [OCME]." Id.

The court therefore concluded that the forensic records did not fall under the "law enforcement" exception to the business records rule that permits admission of the documentary evidence despite the absence of the document's preparer. Id. Furthermore, the court noted that a toxicology report is "not separate and distinct" from the autopsy report, which bolstered its admissibility as a business record. Id.

40

3. Analysis. First, in light of the foregoing analysis, it is apparent to us that the district court's rationale for allowing the forensic report into evidence is of questionable validity because of the doubt subsequent Supreme Court jurisprudence has cast on Feliz, on which the district court relied. Nevertheless, we think the district court's conclusion sound.

There is no indication in Brijmohan's testimony or elsewhere in the record that a criminal investigation was contemplated during the inquiry into the cause of Sewnanan's death.[14] For example, Brijmohan testified that "the rate of poisons taken is pretty high . . . within the East Indian community," Trial Tr. 3253:15-17, suggesting accidental ingestion or suicide rather than homicide.[15] During the course of the autopsy, Brijmohan observed symptoms consistent with poisoning, including congestion in the lungs and hemorrhaging in the stomach, and ordered toxicology tests on that basis. Brijmohan

_____

[14] We note, as did the district court, that the police were unquestionably involved in the Guyanese autopsy process, including, for example, transporting forensic samples for testing. As five Justices in Williams made clear, however, the involvement of "adversarial officials" in an investigation is not dispositive as to whether or not a statement is testimonial. In this case, it appears that was simply the routine procedure employed by the Guyanese medical examiner in investigating all unnatural deaths, and does not indicate that a criminal investigation was contemplated.

[15] Brijmohan was interviewed by a publication called "Hinduism Today" regarding the high rate of suicides, particularly among East Indian males, in Guyana, which he attributed to "cultural problem[s]" and alcoholism. Trial Tr. 3375:15-3377:12.

41

further noted that there were other potential "natural" causes of the types of symptoms that led him to suspect poisoning in general -- not murder in particular -- including alcoholism. In short, we see nothing to indicate that the toxicology report was completed primarily to generate evidence for use at a subsequent criminal trial. We conclude that the toxicology report was nontestimonial, and the district court therefore did not err in allowing its introduction without requiring confrontation of the individual who prepared it.

As Justice Breyer pointed out in Williams, it is still unsettled under the Court's recent Confrontation Clause jurisprudence whether there is a "logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so." Williams, 132 S. Ct. at 2246 (Breyer, J. concurring). While Brijmohan's testimony implicates that question -- he suggested that someone other than Mootoo may also have participated in the preparation of the toxicology report -- we find it unnecessary to answer it in light of our conclusions as to the nature of the report. To the extent that question implicates the evidentiary rules regarding "basis evidence," we also decline to decide whether the toxicology test was properly offered as such here, where the testifying expert had personal involvement in the autopsy process, and he himself ordered the toxicology tests at issue.

42

**II. Exclusion of the Government's Prior Jury Argument**

The defendants contend that the district court abused its discretion in denying their request to introduce an excerpt of the prosecutor's rebuttal summation in the trial of Betty Peter, a cooperating witness, which largely blamed her, and not the defendants in the instant case, for Vernon Peter's murder. "The defense is allowed to introduce a prosecutor's statement from a prior trial when: (1) the prosecution offered an inconsistent assertion of fact at the prior trial; and (2) the prosecution can offer no 'innocent' explanation for the contradiction." United States v. Orena, 32 F.3d 704, 716 (2d Cir. 1994)(citations omitted); see also Fed. R. Evid. 801(d)(2); United States v. McKeon, 738 F.2d 26, 32-33 (2d Cir. 1984).

In McKeon, upon which the defendants principally rely, the court's reasoning was based in large part upon the fact that it was the same defendant on trial in a subsequent proceeding. McKeon, 738 F.2d at 31 (noting the relationship to admissions of a party-opponent in civil proceedings). In any event, McKeon requires that, in order to admit such evidence, the district court must "determine by a preponderance of the evidence that the inference the [party] seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist. Where the evidence is in equipoise or the preponderance favors an innocent explanation, the . . . statement should be excluded." Id. at 33. Here, the government explained

43

that the change in its view towards Peter resulted from a series of proffer sessions after her conviction on various charges including mail fraud, money laundering, and obstruction of justice. The information gleaned from these sessions and corroborated by other witnesses led the government to a different view as to her culpability for Vernon Peter's murder.

We conclude that the district court did not commit clear error in deciding by a preponderance of the evidence that there was an "innocent explanation" for the inconsistency between the government's stated position at the trial of Peter and that in the instant case. The district court therefore did not abuse its discretion in excluding the prior statement. See, e.g., United States v. GAF Corp., 928 F.2d 1253, 1261 n.3 (2d Cir. 1991) (affirming exclusion of a prior bill of particulars where the "the inconsistency is plain, the inferences are clear, and the government itself has offered an explanation -- that it no longer believes that the evidence demonstrates" what it had previously).

Finally, the defendants' argument that a post-trial letter from a cooperating witness implicating Betty Peter in her husband's murder somehow affects the propriety of the district court's ruling is misplaced. The letter was not before the district court at the time it made the ruling. It therefore does not suggest either that the district court's factual finding as to the government's explanation was clearly erroneous, or that it

44

abused its discretion in excluding the prosecution's rebuttal statement.

### III. Limitation on Cross-Examination

The defendants argue that the district court abused its discretion in curtailing their impeachment of Betty Peter with prior inconsistent statements concerning (1) a conversation she had with a member of Sewnanan's family[16] and (2) her understanding of the term "double indemnity." In particular, Peter testified at trial that she had not spoken to Patricia Sewnanan after Hardeo's death, and that she did not know the meaning of the term "double indemnity."

We review for abuse of discretion a district court's decision to preclude evidence offered to impeach a witness. See United States v. Ramirez, 609 F.3d 495, 499 (2d Cir. 2010). A district court "is 'accorded broad discretion in controlling the scope and extent of cross-examination.'" United States v. Caracappa, 614 F.3d 30, 42 (2d Cir. 2010) (quoting United States v. Wilkerson, 361 F.3d 717, 734 (2d Cir.), cert. denied, 543 U.S. 908 (2004)); accord, e.g., United States v. Whitten, 610 F.3d 168, 182 (2d Cir. 2010). Therefore, a "district court may impose 'reasonable limits' on cross-examination to protect against, e.g., harassment, prejudice, confusion, and waste." United States v. Cedeno, 644 F.3d 79, 82 (2d Cir. 2011) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). "In the

---

[16] Precisely what her relationship to Hardeo Sewnanan was is not reflected in the record.

45

exercise of discretion, a district court should consider the need to 'ascertain [the] truth,' 'avoid needless consumption of time,' and 'protect witnesses from harassment or undue embarrassment.'" Whitten, 610 F.3d at 182-83 (quoting Fed. R. Evid. 611(a)).

A district court should afford "wide latitude to a defendant in a criminal case to cross-examine government witnesses," Cedeno, 644 F.3d at 82 (internal quotation marks omitted), because the Confrontation Clause gives a defendant the right not only to cross-examination, but to effective cross-examination, see United States v. Figueroa, 548 F.3d 222, 227 (2d Cir. 2008). But "[i]t does not follow, of course, that the Confrontation Clause prevents a trial judge from imposing any limits on defense counsel's inquiry [in cross-examining] a prosecution witness." Figueroa, 548 F.3d at 227 (quoting Van Arsdall, 475 U.S. at 679) (emphasis added).

The defense sought to introduce evidence that the Sewnanan family bribed the medical examiner to change Hardeo Sewnanan's cause of death to poisoning, rather than disease, so that they could collect on the insurance policy's double indemnity clause. The district court excluded evidence supporting this theory, however, which the defendants do not challenge. Peter's denial that she spoke with Patricia Sewnanan, a member of Sewnanan's family, was therefore irrelevant, because the subject of her discussion was not to be introduced in any event. Moreover, because the subject of Peter's discussion with Sewnanan's family member would not have been in front of the

46

jury, her inconsistency on this collateral matter (whether or not she spoke with the family member) was unlikely to influence the jury's assessment of her credibility, because they were already aware that she was a convicted felon who had begun cooperating with the government.

For similar reasons, impeachment of Peter concerning her understanding of the term "double indemnity" would have had little probative value. In any event, the cross-examination did indeed elicit testimony from Peter in which she explained that she received $400,000 on her husband's $200,000 life insurance policy because "when anybody died accidentally or something, they pay double." Eliciting from Peter that she had been inconsistent in recognizing the term "double indemnity," when it was clear she understood the concept, would therefore also not have affected the jury's assessment of her credibility.

**IV. Motion to Sever**

Defendant James contends that the district court's denial of his motions for severance of his trial from that of his co-defendant Mallay deprived him of a fair trial. "[T]he court may . . . sever the defendants' trials . . . [if] consolidation for trial appears to prejudice a defendant." Fed. R. Crim. P. 14(a). "Considerations of efficiency and consistency militate in favor of trying jointly defendants who were indicted together, [and] [j]oint trials are often particularly appropriate in circumstances where the defendants are charged with participating

47

in the same criminal conspiracy . . . ." United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003) (citations omitted). "The decision to sever a joint trial of federal defendants is committed to the sound discretion of the trial judge[, and is c]onsidered virtually unreviewable." United States v. Diaz, 176 F.3d 52, 102 (2d Cir. 1999) (internal quotation marks and citations omitted). "[T]o compel reversal, the defendant has the heavy burden to show prejudice so severe that his conviction constituted a miscarriage of justice." United States v. Ferguson, 676 F.3d 260, 286-87 (2d Cir. 2011) (internal quotation marks omitted).

James argues that jointly trying him with Mallay, who was also charged with two murders with which James was not charged -- those of Vernon Peter and Alfred Gobin -- caused him prejudice. That evidence, however, was relevant to the racketeering charges against James to prove the formation, existence, and nature of the racketeering enterprise, which involved the murder of individuals to collect on their insurance policies, as well as to show the pattern of racketeering activity. See Diaz, 176 F.3d at 103; United States v. Stewart, 590 F.3d 93, 123-24 (2d Cir. 2009) ("[T]he fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately." (internal quotation marks omitted)).

48

James's argument that there was an irreconcilable conflict between him and Mallay based on Mallay's initial opposition to the introduction of evidence regarding a plot to bribe the Guyanese medical examiner is also without merit. Mallay later joined James in seeking to introduce that evidence. And in any case, "[t]o obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved." United States v. Benitez, 920 F.2d 1080, 1085-86 (2d Cir. 1990) (internal quotation marks and citation omitted). That is not the case here.

**V.    Refusal to Suppress Recorded Statements**

The defendants object to the denial of a motion to suppress statements made by James to Derick Hassan, a government informant wearing a recording device, concerning a plot to murder John Narinesingh.  The defendants argue that because James was already subject to a sealed indictment at the time those statements were recorded, doing so violated his Sixth Amendment right to counsel.

The defendants waived this argument by failing to object to the magistrate judge's recommendation that the motion to suppress be denied, which was adopted by the district court. United States v. James, 415 F. Supp. 2d 132, 137 (E.D.N.Y. 2006). See also Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis,

49

Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010) ("[A] party waives appellate review of a decision in a magistrate judge's Report and Recommendation if the party fails to file timely objections designating the particular issue.").

Even so, as Magistrate Judge Pollack explained at length, the Sixth Amendment right is "offense specific," and the statements James made to the informant were not used to support the charge for which he had been indicted at the time he made those statements -- that charge was subsequently dropped. James, 415 F. Supp. 2d at 158-61. Therefore, the Sixth Amendment did not bar their introduction into evidence.

**VI. Admission of Recorded Statements against Mallay**

Defendant Mallay contends that the conversation between James and Hassan, recorded by Hassan -- also referred to in the previous section -- should not have been admitted against him because that conversation indicates Mallay's withdrawal from the conspiracy, and thus is not admissible as a co-conspirator statement. "A statement . . . is not hearsay if . . . [t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "To admit an out-of-court declaration under this rule, the district court must find by a preponderance of the evidence '(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the

50

statement was made during the course of and in furtherance of the conspiracy.'" United States v. Farhane, 634 F.3d 127, 161 (2d Cir. 2011) (quoting United States v. Al-Moayad, 545 F.3d 139, 173 (2d Cir. 2008)). These three factual predicates must be determined by the district court by "a preponderance of the evidence." In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 137 (2d Cir. 2008) (citing Fed. R. Evid. 104(a)). We review the district court's findings as to each for clear error. See id.

First, the conspiracy must be proven by a preponderance of the evidence to involve both the declarant and the defendant. The district court "may properly find the existence of a criminal conspiracy where the evidence is sufficient to establish, by a preponderance of the evidence, that 'the . . . alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent.'" In re Terrorist Bombings, 552 F.3d at 137-38. Although Rule 801(d)(2)(E) "'requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member.'" Id. at 139 (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989).

Second, to be admissible, the statement must be made "in furtherance of the conspiracy." In general, "'the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy[.]'" United

51

States v. Diaz, 176 F.3d at 85 (quoting United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir. 1993)).  The ways in which a statement might "promote or facilitate" the conspiracy include, among others, "seeking to induce a coconspirator's assistance," id.; "informing coconspirators as to the progress or status of the conspiracy," id.; and prompting a non-coconspirator to respond in some way that "promotes or facilitates the carrying out of a criminal activity," Tracy, 12 F.3d at 1196.  See generally, e.g., In re Terrorist Bombings, 552 F.3d at 139; Diaz, 176 F.3d at 85; United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).  "Because what constitutes a statement that is in furtherance of a conspiracy is essentially a question of fact, we will reverse a decision to admit co-conspirator statements only if it is clearly erroneous."  In re Terrorist Bombings, 552 F.3d at 139 (internal quotation marks omitted).

Mallay contends that at the time of James's and Hassan's conversation regarding the possible murder of Narinesingh he was no longer part of the conspiracy.  As proof, James notes the indication on the tape recorded statement that he is no longer talking to Mallay, and that the two have had a falling out.  That members of a conspiracy have had a disagreement or a falling out is not, however, sufficient to establish withdrawal from the conspiracy.  See, e.g., United States v. Jackson, 335 F.3d 170, 182 (2d Cir. 2003) ("To withdraw from a conspiracy, a person must take some affirmative action either by making a clean breast to the authorities or

communicating the abandonment in a manner reasonably calculated to reach co-conspirators." (internal quotation marks and citations omitted)); United States v. Spero, 331 F.3d 57, 60 (2d Cir. 2003) ("[A conspiracy] is presumed to exist until there has been an affirmative showing that it has been terminated," and its members "continue to be conspirators until there has been an affirmative showing that they have withdrawn." (internal quotation marks omitted)). "An internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it." United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994). Hassan testified that the reason Mallay and James were not talking to one another at the time was not that Mallay had withdrawn from the conspiracy, but rather that Mallay had just undergone heart surgery, a fact stipulated to by the parties. Shortly before his surgery, Mallay procured insurance policies on two persons for more than $2 million, indicating that he continued to participate in the conspiracy at the time of the recorded conversation between Hassan and James. We therefore find no error in the admission of this recording against Mallay.

**VII. Denial of New Trial Motion**

The defendants argue that a post-trial letter from Camuldeen Allie, a cooperating witness, alleging prosecutorial misconduct required a new trial, or at least an evidentiary

53

hearing, and that the district court erred in not granting their requests for either.

We review the denial of a Rule 33 motion for a new trial for abuse of discretion.  See United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009).  Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  In deciding a Rule 33 motion, "[t]he test is whether it would be a manifest injustice to let the guilty verdict stand."  United States v. Lin Guang, 511 F.3d 110, 119 (2d Cir. 2007) (internal quotation marks omitted).  "For a trial judge to grant a Rule 33 motion, he must harbor a real concern that an innocent person may have been convicted."  Id. (internal quotation marks omitted).  To merit relief based on a claim of newly discovered evidence, the burden is on the defendant to satisfy five elements: (1) that the evidence is "newly discovered after trial"; (2) that "facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence"; (3) that "the evidence is material"; (4) that the evidence "is not merely cumulative or impeaching"; and (5) that "the evidence would likely result in an acquittal."  United States v. Owen, 500 F.3d 83, 88 (2d Cir. 2007) (internal citations omitted).

The district court concluded that the allegations contained in Allie's letter -- that an Assistant United States Attorney had coerced him into testifying -- were "a fabrication."

54

James I, 2009 WL 763612, at *7, 2009 U.S. Dist. LEXIS 23706, at *21. The court found that the AUSA Allie accused of coercing him had not yet joined the U.S. Attorney's Office at the time when Allie alleges he was coerced, that Allie had testified that no members of the prosecution team in this case were present during the negotiations that led to his cooperation, and that Allie was represented by counsel when he decided to cooperate. Id., 2009 U.S. Dist. LEXIS 23706, at *20-*21. Furthermore, in his letter, Allie does not ever disclaim his testimony, or suggest it was anything but truthful. Id. at *8, 2009 U.S. Dist. LEXIS 23706, at *21. Finally, the defendants knew that Allie had a motive to cooperate with the government because it was elicited on cross-examination that the government might let the state parole board know of his cooperation. Id., 2009 U.S. Dist. LEXIS 23706, at *21-*22.

While it may be that the contents of the letter provide a reason to doubt Allie's credibility, "a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007) (internal quotation marks omitted). In any event, there is no "reasonable probability" that the outcome of the defendants' trial would have been different had the contents of Allie's letter been disclosed, even if believed. See In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d at 146.

**VIII.  Cumulative Error**

Finally, having concluded that there has been no error in the defendants' trial, it follows that we must reject their claim of cumulative error.  "[That] doctrine finds no foothold in th[ese] appeal[s]."  <u>United States v. Fell</u>, 531 F.3d 197, 233 (2d Cir. 2008) (internal quotation marks omitted).

**CONCLUSION**

For the foregoing reasons, we affirm the judgments of the district court.

56

Case # 09-2732-cr (L)
*United States v. James*

EATON, *Judge*, concurring:

Because of the unsettled state of the law, I agree that the admission into evidence of the

autopsy report prepared by Dr. Jindrak did not constitute plain error. *United States v. Gamez*,

577 F.3d 394, 400 (2d Cir. 2009) ("Typically, we will not find plain error 'where the operative

legal question is unsettled.'") (citations omitted). I respectfully part company with the majority,

however, on its conclusion that the autopsy report was "not testimonial" for purposes of the

Confrontation Clause.

The majority reads recent Supreme Court cases as holding that "a statement triggers the

protections of the Confrontation Clause when it is made with the primary purpose of creating a

record for use at a later criminal trial." This formulation, however, appears to place too much

emphasis on future use in a criminal trial being the primary purpose for the creation of a

testimonial statement. I would not find that this "primary purpose" is the common thread in the

Supreme Court's jurisprudence.[1] Rather, I would find that a testimonial statement is one having

---

[1]     The Supreme Court's use of the "criminal trial" language, while not entirely consistent, tends toward the same idea. *Compare Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2714 n.6 (2011) (quoting *Davis*' "'potentially relevant to a later criminal prosecution'" language in the context of a blood-alcohol test requested by the prosecutor), *Michigan v. Bryant*, 131 S. Ct. 1143, 1148 (2011) (employing *Davis*' "'potentially relevant to a later criminal prosecution'" language in the context of a police interrogation), *and Davis v. Washington*, 547 U.S. 813, 822 (2006) (articulating the "potentially relevant to a later criminal prosecution" language in the context of a 911 call), *with Melendez–Diaz v. Massachusetts*, 129 S. Ct. 2527, 2532 (2009) (quoting *Crawford's* "'available for use at a later trial'" language in the context of a laboratory report requested by the police), *and Crawford v. Washington*, 541 U.S. 36, 51–52 (2004) (listing "available for use at a later trial" among the "[v]arious formulations" of the "core class" of testimonial statements).

1

an evidentiary purpose, declared in a solemn manner, and made under circumstances that would lead a reasonable declarant to understand that it would be available for use prosecutorially.

The point of departure for this analysis is *Crawford*. As I read that case and those that follow it, there are three key considerations for determining if a statement is testimonial. First, "[t]estimony" is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact."[2] *Crawford v. Washington,* 541 U.S. 36, 51 (2004) (citation and internal quotation marks omitted). Thus, at the time of its making, the statement must have an "evidentiary purpose." *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2717 (2011); *Melendez–Diaz v. Massachusetts*, 129 S. Ct. 2527, 2532 (2009). In other words, to be testimonial the declarant must make the statement to "prove past events." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Statements relating ongoing events made to achieve some other purpose, such as receiving medical or police assistance, and forward-looking statements, such as those made in furtherance of a conspiracy or to elicit inculpatory statements from others, lack the required purpose. *Michigan v. Bryant*, 131 S. Ct. 1143, 1157 (2011) (statement made by a mortally wounded victim in need of medical attention did not have an evidentiary purpose); *Davis*, 547

---

[2] Interestingly, not only did "several early American authorities flatly reject[] any special status for coroner statements," the historical precursors of modern medical examiners' reports, one of the cases cited in *Crawford* also stands for the proposition that evidence produced by coroners' investigations requires confrontation, even though the purpose of those investigations was not a purely prosecutorial one. *Crawford,* 541 U.S. at 47 n.2 (citing *State v. Campbell*, 30 S.C.L. 124, 130 (S.C. App. L. 1844) ("The general object, at least, of our Act, would seem to be, to record the whole of the information obtained upon any inquest concerning the sudden or violent death of a man, for the purpose of a prosecution, for satisfaction, or any investigation of the public, or of individuals concerned. So much is due to the living and the dead. Sudden and unnatural deaths shock us all. . . . And let me here observe, that the information and publication of the kind of death, the wound, time and manner, place and circumstances, may often lead to unlooked for charges against unsuspected persons, and even of men abroad. And shall they all be assumed . . . [not to require] cross-examination? Because our Act is general for all inquests, the examination public, and of high respectability? On the contrary, is there not too much of mere formula, if not fiction, in such a notion?").

U.S. at 822 (statements about ongoing events during a 911 call did not have an evidentiary purpose); *United States v. Farhane*, 634 F.3d 127, 131–32, 162–63 (2d Cir. 2011) (statements promising future aid in a conspiracy did not have an evidentiary purpose); *United States v. Burden*, 600 F.3d 204, 225 (2d Cir. 2010) (recorded statements of a cooperating witness made to induce a confession did not have an evidentiary purpose); *cf. United States v. Logan*, 419 F.3d 172, 178 (2d. Cir. 2005) (finding alibi statements made to police were testimonial).

Second, the statement must have been made in a way that is sufficiently solemn so as to make it more like "'a formal statement to government officers'" rather than "'a casual remark [made] to an acquaintance.'" *Bryant*, 131 S. Ct. at 1153 (quoting *Crawford,* 541 U.S. at 51); *Davis*, 547 U.S. at 822 (quoting *Crawford,* 541 U.S. at 51). This does not mean that the statement must be contained in a formal written document, but merely that the circumstances surrounding its utterance must be such that a reasonable declarant would be aware of the serious nature of his or her declaration. *Davis*, 547 U.S. at 826 (citing *Crawford,* 541 U.S. at 51).

Finally, the statement must reasonably be understood as being "available for use at a later trial." *Melendez–Diaz*, 129 S. Ct. at 2532 (quoting *Crawford,* 541 U.S. at 52). That is, the speaker need not expect that the statement will be used in a criminal trial, or even that it is objectively likely that the statement will be used in a criminal trial, only that it is foreseeable that the statement could be used prosecutorially. *Bryant*, 131 S. Ct. at 1169 (Scalia, J. dissenting) ("[H]e must make the statement with the understanding that it may be used to invoke the coercive machinery of the State."); *see also Melendez–Diaz*, 129 S. Ct. at 2532 ("[T]he affidavits [were] 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (quoting *Crawford,* 541 U.S. at 52)).

Applying this formulation, it is evident that the admission of Dr. Jindrak's report triggered the Confrontation Clause. First, the autopsy report was, inarguably, created to establish facts regarding the death of Mr. Somaipersaud. The report and its incorporated laboratory analyses contain five final diagnoses, two statements of cause of death, detailed descriptions of various portions of Mr. Somaipersaud's body, and calculated levels of toxins, all of which are factual statements.

Second, the report is sufficiently solemn. All reports generated by the New York City Office of Chief Medical Examiner ("OCME") are required to "be signed by the medical examiner performing the autopsy." N.Y.C. Admin. Code § 17-203 (1998). These reports are made by government officials for use by government officials. *See United States v. Feliz*, 467 F.3d 227, 2337 (2d Cir. 2006) (observing that OCME reports would qualify for the public records hearsay exception, which requires that the statement be made by a public officer or agency). Indeed, even if OCME did not have a long history of cooperation with law enforcement, all autopsy reports would remain statements made directly to law enforcement insofar as they are statutorily required to be available to law enforcement officers and prosecutors. N.Y.C. Admin. Code § 17-205 (1998) ("The appropriate district attorney and the police commissioner of the city may require from [OCME] such further records, and such daily information, as they may deem necessary.") Moreover, like the reports in *Bullcoming* and *Melendez–Diaz*, Dr. Jindrak's report contains a certification.

Third, it could have reasonably been anticipated that the autopsy report would be available for use in a criminal trial. Medical examiners working for OCME are statutorily obligated to make conclusions as to causes of death, to record the reasons for those conclusions, and to preserve those records for future use. N.Y.C. Admin. Code § 17-203 ("A detailed

4

description of [those] findings . . . shall be written or dictated. . . . The findings of the investigation at the scene of death, the autopsy and any toxicologic, histologic, serologic and microbiologic examinations, and the conclusions drawn therefrom shall be filed in the office of chief medical examiner.").

Even if it could not have been reasonably foreseen at the outset of the autopsy that the report's results would be used in a later trial, it seems clear that, at some point during her examination, Dr. Jindrak would reasonably have anticipated that it could be used later in a criminal prosecution. That is, once she certified that the primary cause of death was "acute mixed intoxication with alcohol and chlorpromazine," i.e., that Mr. Somaipersaud had been poisoned, a reasonable medical examiner would have anticipated that the autopsy report could be used prosecutorially. *See Bryant*, 131 S. Ct. at 1159 (observing that non-testimonial statements may "evolve into testimonial statements" as more information is provided (quoting *Davis*, 547 U.S. at 828 (internal quotation marks omitted))).

When a statement such as Dr. Jindrak's autopsy report is introduced against a defendant at a criminal trial, that evidence is "functionally identical to live, in-court testimony, because [it does] 'precisely what a witness does on direct examination,'" rendering its declarant a "witness" and triggering the protections of the Confrontation Clause. *Melendez–Diaz*, 129 S. Ct. at 2532 (quoting *Davis*, 547 U.S. at 830); *see also Bullcoming*, 131 S. Ct. at 2712; *Crawford,* 541 U.S. at 51.

James was both charged with and convicted of murder and conspiracy to commit murder. The prosecution's theory was that Mr. Somaipersaud had been poisoned. The prosecution offered the autopsy report to establish the very same facts, prejudicial to Mr. James, about which Dr. Jindrak would have been expected to testify at trial. Indeed, on direct examination, Dr.

5

Ambrosi was asked both to identify Dr. Jindrak's conclusions as to cause of death and to state whether she agreed with those conclusions.

Moreover, I believe that the admission of any medical examiner's report prepared by OCME would trigger the protections of the Confrontation Clause.[3] Dr. Jindrak's report was not unique in the sense that the characteristics that made it testimonial are present in all autopsy reports prepared by OCME that are introduced against a defendant at a criminal trial. All such reports are made to establish facts about the cause of death of the decedent; they are made by and to government officials in a formalized recording; they contain statements a medical examiner could reasonably foresee would be used in a criminal prosecution; and if a prosecutor seeks to introduce a report for its truth, it would substitute for live testimony adverse to the defendant.

As noted, I believe that the majority's approach goes astray by suggesting that to trigger the Confrontation Clause the "primary purpose" of an autopsy report must be use "at a later criminal trial." This formulation postulates the existence of a medical examiner who gives adverse testimony but who is not a "witness" for Confrontation Clause purposes because he or she did not prepare the autopsy report primarily for use in criminal proceedings. In doing so, the opinion creates the very "third category of witnesses, helpful to the prosecution, but somehow immune from confrontation" that *Melendez–Diaz* expressly says does not exist. *Melendez–Diaz,* 129 S. Ct. at 2534.

---

[3] At least two other federal circuits and a number of state courts of last resort have reached a similar conclusion regarding particular reports prepared by the equivalent of OCME in their jurisdictions. *See, e.g.*, *United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012); *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011); *State v. Navarette*, 294 P.3d 435 (N.M. 2013); *State v. Kennedy*, 735 S.E.2d 905 (W. Va. 2012); *Conners v. State*, 92 So.3d 676 (Miss. 2012) (noting a pre-*Crawford* decision that held admission of an autopsy report required confrontation); *State v. Locklear*, 681 S.E.2d 293 (N.C. 2009); *see also People v. Lewis*, 806 N.W.2d 295 (Mich. 2011) (vacating lower court's holding that an autopsy report was non-testimonial but holding the error harmless without significant discussion); *Wood v. State*, 299 S.W.3d 200 (Tex. Ct. App. 2009), *review denied,* 2010 Tex.Crim.App. LEXIS 115 (2010).

Finally, as the Eleventh Circuit points out, "[m]edical examiners are not mere scriveners" and "autopsy reports are the product of the skill, methodology, and judgment of the highly trained examiners who actually performed the autopsy." *United States v. Ignasiak*, 667 F.3d 1217, 1232 (11th  Cir. 2012) (holding autopsy reports to be testimonial and requiring confrontation) (citing *Bullcoming*, 131 S. Ct. at 2714).  Both *Bullcoming* and *Melendez–Diaz* hold that a laboratory analyst's report of sufficient solemnity triggers the protections of the Confrontation Clause.  It would be incongruous indeed, if an autopsy report requiring numerous skilled judgments on the part of a medical examiner, did not require the same confrontation.