OPINION OF THE COURT
April A. Newbauer, J.
Defendant M.F. is charged with rape in the first degree and related charges arising from an alleged incident that took place on September 5, 2010 at the Capri Motel in Bronx, New York. Defendant moved in limine for an order precluding the prosecution from seeking to admit a DNA report without calling to testify each of the five or six criminalists who had a role in preparing the report for the Office of the Chief Medical Examiner (OCME). Defendant claims his confrontation rights under the Sixth Amendment and New York law will be violated if the results of the report are allowed to be introduced through the analyst who made the final assessment of the data.
The defense motion raises a new issue for New York courts in the wake of the United States Supreme Court’s decision in Williams v Illinois (567 US —, 132 S Ct 2221 [2012]), another in the line of Sixth Amendment Confrontation Clause cases decided after Crawford v Washington (541 US 36 [2004]). The High Court’s unusual decision, in which no five justices agreed on the rationale for the result, has been the subject of much debate in courts since it was issued. (See e.g. United States v James, 712 F3d 79 [2d Cir 2013]; Young v United States, 63 A3d 1033 [DC 2013]; Maryland v Norton, 443 Md 517, 117 A3d 1055 [2015]; New Jersey v Michaels, 219 NJ 1, 95 A3d 648 [2014]; Tennessee v Dotson, 450 SW3d 1 [Tenn 2014]; Marshall v People, 309 P3d 943 [Colo 2013].)[1] The question the Court faced in Williams was whether a DNA expert witness’s response to a prosecutor’s question “[w]as there a . . . match” between *329 the “DNA profile found in semen from the vaginal swabs of [the victim]” and the defendant’s DNA profile violated the Confrontation Clause. (Williams, 567 US at —, 132 S Ct at 2236.) The defendant in Williams was convicted following a bench trial in which the laboratory report was never admitted into evidence, but simply used as a premise for the prosecutor’s purported hypothetical questions to the expert witness. Writing for the four-member plurality, Justice Alito found that the expert’s answer “yes” to the question of a match was proper although she had no personal knowledge that the matching profile was taken from the victim’s vaginal swabs.[2] Justice Alito explained that in the plurality’s view, the phrase “found in semen from the vaginal swabs” was a mere premise for the expert’s answer to the question and so not admitted for its truth, and moreover made in the context of a bench trial where the judge would have understood the concept of hearsay and the legal distinction. (Id.) The victim had also been able to identify her attacker from a lineup, providing an underpinning of reliability for the testimony. (567 US at —, 132 S Ct at 2228.)
Justice Alito went on to say that if the laboratory report had been introduced for its truth there would have been no Confrontation Clause problem because the primary purpose of the testing and report was not to accuse a targeted individual. The report in Williams was prepared in advance of the identification of the defendant as a suspect, so it did not raise the same confrontation concerns as cases in which a particular suspect had been identified. As here, the report was prepared for the purpose of finding an unknown suspect “on the loose.” (See Williams, 567 US at —, 132 S Ct at 2228.) Justice Alito also noted that DNA laboratory analysis usually entails a *330 number of technicians working on separate tasks to develop a DNA profile during the testing process in accordance with established procedures, as in the case before this court. (567 US at —, 132 S Ct at 2244.)
The four dissenting Justices in Williams (567 US at —, 123 S Ct at 2257) saw no meaningful distinction between disclosing the out-of-court statement so the factfinder might evaluate the expert’s opinion, and disclosing that statement for its truth. In addition, the dissent would have found the report to be testimonial under a Crawford analysis. (567 US at —, 123 S Ct at 2275.) Justice Kagan, writing for the dissent, characterized the plurality opinion as a sharp diversion from the Court’s recent Confrontation Clause cases[3] in which convictions were reversed based on drug and alcohol testing evidence admitted in the absence of a laboratory analyst who could be cross-examined by the defense:[4]
“[T]he plurality offers a host of reasons for why reports like this one are reliable: ‘[T]here is no prospect of fabrication,’ multiple technicians may ‘work on each DNA profile,’ and ‘defects in a DNA profile may often be detected from the profile itself.’ But once again: Been there, done that. In Melendez-Diaz, this Court rejected identical arguments, noting extensive documentation of‘[s]erious deficiencies ... in the forensic evidence used in criminal trials.’ Scientific testing is ‘technical,’ to be sure; but it is only as reliable as the people who perform it. That is why a defendant may wish to ask the analyst a variety of questions: How much experience do you have? Have you ever made mistakes in the past? Did you test the right sample? Use the right procedures? Contaminate the sample in any way? Indeed, as scientific evidence plays a larger *331 and larger role in criminal prosecutions, those inquiries will often be the most important in the case.” (Williams, 567 US at —, 123 S Ct at 2274-2275 [Kagan, J., dissenting] [citations omitted].)
Although ultimately acknowledging that some aspects of scientific testing are more technical than others, the dissenting Justices would require, at a minimum, an analyst witness who could answer all the questions regarding protocols, testing and analysis for a particular laboratory in order to lay the foundation to admit a DNA report. (Id.)
In his concurring opinion, Justice Breyer asserts that the fragmented Court in Williams (567 US at —, 132 S Ct at 2247) has not provided a clear framework for trial courts to understand the limits of the Confrontation Clause in ruling on the admissibility of scientific reports. Justice Breyer notes that different approaches have been suggested, including “the dominant approach”—which requires consideration of the quality of the laboratory report, the testifying expert’s involvement in the process, and the consequent ability of the testifying expert to use independent judgment and interpretive skill. (Id.) Other approaches weigh such factors as the availability of the various analysts in the chain and whether an analyst is more or less a technician who simply performs largely mechanical or ministerial tasks. As Justice Breyer notes, state court analyses have all tended to reach some boundary area in applying Crawford to the introduction of scientific data. (Id. )
Following Williams v Illinois, the New York Court of Appeals decided People v Pealer (20 NY3d 447 [2013]) and approved the admission of the results of a blood alcohol test in the absence of the technician who calibrated the breathalyzer machine. In its analysis in Pealer, the Court of Appeals appeared to reaffirm its prior ruling in People v Brown (13 NY3d 332 [2009]) that a graphical DNA report that did not explicitly tie the accused to a crime was deemed not to be testimonial. (See also People v Payne, 115 AD3d 439 [1st Dept 2014].) The Court of Appeals did not specifically address the controversy surrounding the precedential value of Williams. In the earlier case of People v Brown, the witness called by the prosecutor was the sole forensic biologist who did the comparison of the defendant’s DNA to the specimen from the victim’s rape kit. The remainder of the report merely consisted of machine generated graphs, charts and numerical data. “There were no conclusions, interpretations or comparisons apparent in the report” *332 and technicians who were not analysts would have nothing to say except how they conducted the procedures to produce the numbers. (13 NY3d at 340.)
Because the prosecution called the testing analyst at the trial, the Court in Brown did not reach the question of admitting a DNA report in the absence of a witness who could testify from personal knowledge that the laboratory profile was derived from the victim’s vaginal swabs. Even the Supreme Court plurality in Williams acknowledged the problematic hearsay issue created in admitting this evidence in a jury trial. On this point the Court was openly more divided as to whether the report could be introduced without calling the analyst who performed the initial extraction from the rape kit. The problem is magnified if it is coupled with a rape victim’s inability to identify her attacker, as in this case.
Further, the Court in Williams v Illinois considered these issues in the context of a nonjury trial. Applying such tenuous legal precedent to a case in which scientific conclusions will be proffered to a jury requires review of the proposed report and a careful consideration of the steps taken by various individuals at the laboratory to prepare the final product. In People v Pealer (20 NY3d 447 [2013]) the Court of Appeals signaled its inclination toward a general rule that mere data itself is not testimonial, but the rationale that data is produced by neutral scientific processes must be coupled with consideration of any arguments and facts which would tend to support a contention that the work of any particular individual was more than “technical.”
In the case before this court, there were three phases to the production of the final report: (1) the initial visual inspection and analysis of the complainant’s specimen; (2) the automated and computer imaging processes performed by four or five technicians to produce the DNA graphical profile; and (3) the comparison by a final analyst of the lab profile to the defendant’s known DNA profile. The People have made an offer of proof of the OCME report and intend to call as both fact and expert witness a supervising analyst who reviewed the underlying data and drew the ultimate conclusion that the sample taken from the complainant’s cervical specimen matched the defendant’s known sample. This supervisor[5] is a longtime OCME employee and familiar with the laboratory’s procedures and testing protocols. She is competent to answer questions *333 concerning the procedures utilized to produce the graphical data.[6] Therefore, the People contend she may serve as a records witness for the admission of the report under the business records rule as well as offer her analysis and conclusions as an expert.
Despite the supervising analyst’s credentials and role in this case, the defense contends that each individual who conducted a task must be called because of the risk of contamination and the presumptions technicians make at each step of the testing process. This argument essentially represents the view of at least some of the dissenting Justices in Williams, namely that the practical difficulties of calling at trial every person in the testing process, regardless of his or her role, should be secondary to the defendant’s confrontation rights. This blanket approach was implicitly rejected by the Court of Appeals in People v Pealer as noted above. Except for contamination—which could be expected to produce unclear or confusing results justifying retesting—it is unclear what the additional analysts could reveal at trial about the infirmities of the laboratory processes that would not equally be a subject of cross-examination for a supervising analyst. Any deficiency in the protocols themselves may be explored—perhaps more effectively—through cross-examining a supervising analyst. Given a laboratory with well established protocols, in-court testimony of every analyst who operated machinery is unnecessary. The People have made a sufficient offer of proof that a qualified expert from the laboratory that produced the report will be called to testify and be subject to challenge on her findings and conclusions. If any stage of the testing or particular analyst’s work is then called into question by the cross-examination, the defense may renew *334 its application to the court to have the prosecution call an additional witness.[7] This procedure is essentially what Justice Breyer suggests in his concurrence in Williams v Illinois (567 US at —, 132 S Ct at 2248).
An important factor distinguishing this case from Williams is that the alleged rape victim was unable to make an identification—the sole evidence against the defendant is the DNA match produced as a result of laboratory analysis. The original profile developed to identify a suspect is critical, and therefore, more scrutiny is necessary of the initial steps taken by the analyst who received the specimen and conducted the first-stage protocols. (Cf. Martin v State of Delaware, 60 A3d 1100 [Del 2013].) Here, the perpetrator’s identity was unknown to the complainant. The first analyst (Zhang) is also a witness to the completion of the chain of custody in the laboratory. Whether or not such analysis is always testimonial,[8] in this instance there is also evidence in the report of procedural steps requiring decisionmaking and judgment by the analyst who received and opened the “rape kit.” There was no involvement by the supervising analyst at that stage, and no way to “review” the specimens by simply reading the report. (See Bullcoming v New Mexico, 564 US at 668 [Sotomayor, J., concurring].) The initial analyst decided after a visual examination of the specimens to put only the cervical swab through testing, noting, “the most sperm seen on the cervical slide.” In this sense, the defense is persuasive that the first analyst’s role is not limited to application of a formula, but includes “assertive conduct” (see Young v Unites States, 63 A3d at 1045) and “diagnosis.” (See State of New Jersey v Michaels, 219 NJ at 35, 95 A3d at 669.) Her reasoning is not clarified except that the lone statement and her handwritten notes on this aspect of the testing do not appear to be part of a typewritten, fill-in- *335 the-blanks form indicative of mere technical work. In addition, this is not a case in which there would be no plausible explanation for how the laboratory could have produced a DNA profile that matched the defendant’s from any sample other than the victim because she was unable to identify her attacker. Finally, though not as significant, the People indicate that Zhang is also still working at the OCME laboratory and would be available to testify. For all the reasons above, I find Zhang’s section of the report to be testimonial and in order to admit her results for their truth the People must call Zhang to testify and permit her to be cross-examined by the defense.
In sum, the motion to bar admission of the DNA report in the absence of laboratory witnesses is separated into three distinct components: (a) the initial analysis, in which the initial analyst took the alleged victim’s cervical sample; (b) the machine driven testing performed by several technicians; and (c) the analysis of the data and the report’s conclusions as found by the supervising analyst. The initial analyst’s work is deemed to be testimonial and the technical preparation of the DNA graphs is presumed not to be testimonial subject to contrary evidence elicited at trial. The data resulting from the testing protocols will be admissible through the testimony of the witness the People have proffered, the supervising analyst. Accordingly, the defense motion is granted in part and denied in part.

. In Williams (567 US —, 132 S Ct 2221), Justice Alito wrote the plurality opinion in which Chief Justice Roberts and Justices Kennedy and Breyer *329 joined. Justice Breyer concurred in a separate opinion, and Justice Thomas concurred in the judgment only, offering a different analysis of “testimonial” evidence under Crawford v Washington. Justice Kagan wrote for the four-member dissent, which included Justice Scalia, the author of Crawford. When a divided Supreme Court decides a case without an overarching rationale, the holding of the Court is the “position taken by those Members who concurred in the judgments on the narrowest grounds.” (See Marks v United States, 430 US 188, 193 [1977].) Subsequent courts have tended to conclude that the splintered Williams Court did not generate even a narrow rationale to be applied in future cases. (See e.g. United States v James, 712 F3d 79 [2d Cir 2013].) At least one state has “retreated” from Williams to follow its earlier precedent. (See Maryland v Norton, 443 Md 517, 117 A3d 1055 [2015].)

. Under Illinois law, an expert is permitted to disclose facts on which the expert’s opinion is based even if the expert is not competent to testify to those underlying facts. (See Williams, 567 US at —, 132 S Ct at 2228.)

. Both Melendez-Diaz v Massachusetts (557 US 305 [2009] [laboratory results indicated cocaine present]) and Bullcoming v New Mexico (564 US 647 [2011] [forensic report indicated blood alcohol concentration]) held that reports containing analysis of scientific data may not be admitted as evidence against a defendant facing criminal charges unless the analyst who prepared and certified the report is called to testify, and is thus made subject to cross-examination.

. As noted in the plurality and Justice Breyer’s concurring opinion, in every post-Crawford case in which the Supreme Court found a Confrontation Clause problem, the statement at issue had at its primary purpose proof against a targeted person. (See Williams, 567 US at —, 132 S Ct at 2243, 2251.)

. A level four criminalist, the highest grade of analyst at OCME.

. After the evidence sample is confirmed to contain sperm by visual examination under a microscope, a swab is cut and a chemical test is performed to extract DNA. The DNA present is measured (“quantified”) to ensure there is sufficient material for testing. The DNA strands are then amplified using a polymerase chain reaction process to magnify the DNA to a workable level. Essentially, in 28 cycles the twisted strands of DNA are sliced in half vertically. Each half-ladder then bonds with chemicals to produce a ladder identical to the original, so that there are twice the number of complete ladders as before. After 28 cycles, the resulting sample is 2 to the 28th power times larger than the original sample. Then the DNA is passed through a gel and an electrophoresis machine separates and displays each important locus, creating a line graph with peaks called an electropherogram. An analyst would then review the graph and decide the significance of any weak or stray peaks. (See Williams, 567 US at —, 132 S Ct 2221 [appendix to opinion of Breyer, J.]; People v Collins, 49 Misc 3d 595, 604 [Sup Ct, Kings County 2015] [“standard DNA analysis is well accepted”].) Under this analysis, one in 6.8 trillion people share a profile. (Id. at 602.)

. Although, as Justice Alito observes, a defendant is free to subpoena any participant in the testing process and call him or her as a defense witness, this is often an imperfect remedy and certainly does not address the Crawford issue.

. Another area of contention after Williams v Illinois is whether evidence is “testimonial” under Crawford v Washington if it was developed with no identifiable suspect in mind. Some courts have held after Williams that its primary purpose was still testimonial, to establish a past fact relevant to later prosecution, the identity (DNA profile) of the yet unknown suspect. (See Young v Unites States, 63 A3d 1033 [2013].) For the Supreme Court plurality, that alone would not render the analyst’s input testimonial because no specific individual was targeted. (See Williams v Illinois, 567 US at —, 132 S Ct at 2228; see also People v Washington, 108 AD3d 576 [2d Dept 2013].)