Curia, per

Richardson, J.
The point of law for the court is presented by the first ground taken in the appeal of the prisoner, Daniel Campbell, to wit: — “ That the presiding judge admitted the depositions of Rosier Kelly, before the coroner, in evidence against the defendant, on proof that R. Kelly had died since the holding of the coroner’s inquest, although the defendant was not present at the examination of the said R. Kelly, and had no opportunity of cross-examination.”
The question is this. Is it indispensable, by the rules oi legal evidence, that the defendant, Daniel Campbell, *125 must have been present; or, at least, -had an opportunity of hearing and examining R. -Kelly, when his depositions were taken, upon the inquest holden over the body of the deceased, A. Defee, in order to render such depositions competent- evidence against Daniel Campbell, upon his trial before the jury for the murder of Defee; when the witness died, after such depositions had been taken ?
Is the right of cross-examining every witness so important as to exclude such depositions, although taken by high authority, and the witness be dead; and where the evidence would be lost to the' State ? But, notwithstanding all this, if we are to decide the question by the established rules of the common law, there could not be a dissenting voice. For, notwithstanding the death of the witness, and whatever the respectability of the court taking the depositions, the solemnity of the occasion and the weight of the testimony, such depositions are ex parte, and, therefore, utterly incompetent. / The reason is, because depositions so taken, and however true, constitute matter, as law writers express it — “inter alios acta.’-’ The prisoner was not there; the witness,, when deposing, was not confronted by him; and against such absentee, the Court of Sessions could not have examined a witness against Daniel Campbell, when on trial for the murder of Deiee, while Campbell was absent from the court.
The primary principle upon which so strict a rule of law rests, is this — no court can take the life of a man, but by the conviction of the accused, effected in the due course of law; that is, in this instance, by the trial by jury. The 9th art. sec. 2 of the State Constitution, 1 Stat. 191, and the 46th sec. of Magna Carta, 1 Stat. 88, are identical and conclusive on this point. , And one of the indispensable conditions of such due course of law- is, that prosecutions be carried on to the conviction of the accused, by witnesses confronted by him, and subjected to his personal examination. The defendant’s cross-examination expresses well the searching process and practical test furnished and intended by this rule of law; in -order, to correct any misconception of facts, to elicit truth, and justify the severe retribution awarded in cases of clear guilt.
*126 All common law writers on evidence lay down the three following prerequisite, as tests of all oral or viva voce testimony, in order to render it legal evidence. First. That the witness put on the stand,.upon his oath, must believe in its obligation upon him, here and hereafter, to tell the truth. Secondly. He must have taken the judicial oath prescribed by law — none other can be substituted. And, thirdly, He must be subjected, personally, to the examination of the man he accuses.
The two- former prerequisites are of the general provision of the laws, in order to invoke the religious belief, and confirm the natural veracity of the moral sense of man ; .the third, (cross-examination) is the practical test of the truth the law would elicit, and no more. This is’ the privilege of the accused, which he may, or may not, exercise at his own discretion. But the opportunity of examining every' witness, is essential to the principle of a legal conviction, in “due course of law.”
The practical good sense of such examination of witnesses, confronted by the accused, is readily understood. Any man of experience who has heard tales told by one man against his neighbor, behind his back, and again told, when plaeed face to face, and new views are suggested by the man he had accused, and possibly belied — any one that has known such occurrences, will readily conceive, from his own experience and observation, of the justice, reason, and necessity of applying, to every witness, this third test of the truth of his narration. Experience has proved that it is, of all others, the most effective, the most satisfactory, and the most indispensable test of the evidence narrated on the witness’s stand. Any one may avow the obligation, and take the judicial oath. Knavery or perjury has, perhaps, never been detected in either of these acts. As to them, the accused is a mere spectator. And it is only in the examination and cross-examination, that the knave can be detected, errors of fact exposed, or false imaginations expunged, and the whole narration of a witness reduced ,down to its measure of exact truth and legal application to the particular case before the court.
*127 If this strict personal examination and confronting of witnesses be considered, according to my .views, as one of the safeguards to shield the lives of men against erroneous or imaginary prejudice, or false charges, judicial opinions will, unavoidably, cleave more strongly to this privilege of the accused in every case. But, under other views of the little importance of the cross-examination, the same opinions will more readily yield to analogous decisions, respectable dicta, and convenient practice ; and suffer it to be frittered away, or at least, qualified, as a test of little accused, or subject to convenient.exceptioiwC
The comparative importance attached bykne undestand- % ing to this third common law test of may, then, very well form the pivot of opinion in the case jjj before the court. It is certainly the groun<fl ■ £i my opinion, against what I readily 'admit, «¿that the^s*^ are, in the elder English reports, analogous counfiifciEiech sions — though I think quite uncertain, as to the precise point of the absence of the accused at the taking of the depositions — held competent by the court in those cases ; and that respectable dicta and practice may be arrayed in support of the argument on the other side of the question. And, of course, there may well be two opinions. But the consideration of such authorities properly belongs to the second, and only further head of 'the argument.
For the, present, I .will only add to my .own exposition of the privileges and importance of the cross-examination, the authority of Starkie on Evidence, and refer, generally, to Russel, Roscoe and Phillips, on the same subject, who all agree, in this respect, with Starkie. I know of no disagreement among the expounders of evidence upon the importance of the cross-examination. But, while naming those four respected writers, I will notice in advance their striking agreement in. another particular ; una voce, they notice the English decisions on the question, now before this court, from their main foundation and origin in Lord Morley's case, 7 State Trials, 421, downwards. They notice them respectfully, yet obviously, as precedents, not to follow, but to deter, and to be guarded against. in the proper construction of the English Statute of 1 & 2 P. *128 M. upon which the present case turns. But of this hereafter.
Starkie, after discussing the other tests to which witnesses are subjected, proceeds thus, sec. 70, p. 96 — “And next, the power given to the party, against whom evidence is offered, of cross-examining the witness,” <fcc. “constitutes a strong test, both of the ability and the willingness of the witness to declare the truth.” “The opportunity,” &c. “his ability to acquire the requisite knowledge, his powers of memory, his situation with respect to the parties, his motives, are all severally scrutinized and examined.”— “Under such circumstances, it must be very difficult to interweave a false account so nicely with the truth, as to make it consistent and agree with all the other circumstances of the case,” <&c. “ It operates to the exclusion of all that is usually described as res inter alios acta? Can one doubt that this is the true practical testl
An upright man requires neither oath nor appeal to his faith, but yet may be mistaken, and require the same test -r and a knave must have it applied, as the most essential for his detection. But further — every man may have observed the facility with which very many good men lend themselves to the impressions of a sudden emergency, temporary excitement, or neighborhood sympathy, especially upon an alarming outcry of bloodshed and murderous violence. And such are the cases for the coroner’s inquest, and, of necessity, hastily urged on to trial. Cases that the Courts of Sessions would postpone,, to let the witnesses, and even jurors, cool down to a rational temperance. The coroners’s cases should, therefore, be among the last to dispense with airy of the common law guards.
2. Now, then, what is the degree of Legislative enactment, or the weight of judicial authority, that would justify this court in permitting the prisoner, Daniel Campbell, to be impugned by the depositions of R. Kelly, taken in the prisoner’s absence? These are to be now considered by the court. Has this privilege been taken away, in the particular instance of depositions taken before the coroner,, either by the English Statute of 1 tfe 2 P. & M.- or by our recent Act of 1839 ?
*129 The statute is as follows : — “Every coroner, upon inquisition before him found, whereby any person or persons shall be indicted for murder or manslaughter, or as acces-sary or accessaries to the same, before the murder or manslaughter committed, shall put, in writing, the effect of the evidence given to the jury before him, being material; and shall certify the same evidence to the next Court of Sessions.” 1 & 2 P. & M. 5 sec. 2 Stat. 482.
Our Act of 1839, p. 51, enacts — “ That the testimony of all witnesses examined on inquest, shall'be taken down in writing, by the coroner, and signed by the witnesses.” And at p. 53 — “The original inquest and evidence are to be returned to the clerk of the district.” ,
By this Act the provisions of-the Statute of P. & M. are extended to every inquest of the coroner.
The general object, at least, of our Act, would seem to be, to record the whole of the information obtained upon any inquest concerniilg the sudden or violent death of a man, for the purpose of a prosecution, for satisfaction, or any investigation of the public, or of individuals concerned. So much is due to the living and the dead. Sudden and unnatural deaths shock us, all. But I cannot see a word in either Act, to justify any alteration in the established rules of evidence, or the rights of parties. Before the statute, the coroner took the same evidence — now he writes and returns it. .And let me here observe, that the information and publication of the kind of death, the wound, time and manner, place and circumstances, may often lead to unlooked for charges against unsuspected persons, and even of men abroad. And shall they all be assumed per leges, to have neglected, though absent, the time of cross-examination ? Because our Act is general for all inquests, the examination public, and of high respectability ? On the contrary, is there not too much of mere formula, if not fiction, in such a notion?-
Where life is perilled, the one only competent court and jury, should proceed upon their own proper responsibility. And if ineffectual, then, in the proper principles of our criminal code — not merely in the sentiments of Becaria — it is better that the guilty wretch shall be given up to the *130 solitary forum of his conscious guilt, rather than a case dangerous to the unwary or innocent, should creep into judicial precedent.
Neither the Statute nor the Act has any express provision, that the depositions shall go to the jury in any case. But the Statute P. & M. has been so expounded: — Provided the accused was present, and had the opportunity of a cross-examination, and the witness be dead, <fcc.
So much may be conceded as well settled. See East Pl. of Cr. 440 ; Leach, 14 ; Buller, 43; Salk. 281. This, in some sort at least, respects the right of cross-examination. But that the deposition of a witness, taken before the coroner, in the absence of the accused, has been made legal evidence, so as to dispense with the right of cross-examination, in cases where the witness has died before the final trial, has not, as far as I have discovered, been plainly adjudged, even in the English cases, and certainly has never been decided by our own courts. On the contrary, that question stands not only open under our own decisions, but under a respectable judicial consideration of the English cases upon the subject, concluding with a plain opinion adverse to the competency of such depositions.
The opinion interwoven in the case of The State vs. Hill, 2 Hill, 607, though not a formal adjudication upon this point, was yet formed upon a full and argumentative review of the English cases, and of the law of evidence- — • of evidence, to use a well known figurative expression and fine illustration of Judge Wattes, in- — -case, as "filtrated” through the strong* and matured understandings of profound and experienced modern jurists, dijesting well-considered adjudications.
It is to such writers, and to modern decisions, that we are to look for our practical doctrines in respect to evidence, in criminal as well as commercial cases, and by no means so much to the old English cases, adjudged, in the one instance, at a time when there was little commerce, and in the other, when a supposed felon had no counsel, no process to enforoe the attendance of his witnesses, and no right to have them sworn in court. Who would look to Sir W. Raleigh’s or Lord Russell’s case for a fair trial or just judgment ?
*131 I do think that it has been already shewn, that there is sound reasoning, founded on the best principles of evidence, for the opinions of Starkie, Phillips, Russell and Roscoe, and of Judge Johnson, in The State vs. Hill, all concurring, and suggesting a reconsideration of the old English cases on the point before us. And, I may fairly say, without disrespect to the twelve judges of England, that the opinion expressed in The State vs. Hill, may be rationally set off against the resolves made at their conference, upon the occasion of Lord Morley’s trial before the Peers, and which resolves have formed the foundation of the construction of 1 & 2 P. & M, and led to the practice, dicta, and acquiesence of some, not all, of the English judges, and to the cases that followed. It cannot escape observation that, at most, their resolves were no more than respectable obiter dicta, (See 7 State Trials, 421,) and made before the meeting of the Peers who tried Lord Morley.
The resolutions of judges do not form authoritative and binding decisions, any more than the voluntary opinion in The State vs. Hill. Thus, then, even in the English courts, the precise point of this case stands as one of uncertain final adjudication ; with a practice assuming it to have been decided; but with a‘ catalogue of their best expounders of evidence opposed to the supposed judicial construction, and questioning its consistency with a principle established for the protection and safety of life itself. In such a case, we cannot yield so much to less than the most binding authority.
When money or property is taken from us, it still enures to the general convenience and advantage of society; thousands are still heirs to it. But when life or member is destroyed, they pass from the world, and there is no requital. It follows, that such inflictions must be in’ strictest conformity to established law-, and only when the case is clearly within the lex terra and its due course, and the punishment the result of human necessities.
If left to my own understanding, I cannot conceive how judges could have resolved, that the depositions of deceased witnesses, when examined by the coroner, should be received as competent evidence at the final trial of life and *132 death — but by assuming that the written testimony had been taken under all the guards and tests of the common' law, and especially those of the cross-examination. And I should so expound the resolves of the twelve judges, as not to infract the privilege of the cross-examination in any case; and, emphatically, in the unavoidable and hasty examinations before coroners, super visum corporis.
Upon the whole, therefore, I cannot but conclude, that we are still left to the rational construction of both the statute of Phillip and Mary, and the extension of its provisions by our Act of 1839 to all inquests. To be governed in • that construction, in the instance before the court, by the common law test in the right of the prisoner to have been present at the examination of It. Kelly, before his depositions can be received as competent evidence before the jury.
A new trial is, therefore, ordered.
Butler, Wardlaw and Frost, JJ. concurred.