DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JULIO ROCAEL AGUILAR LOPEZ,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2023-0104

[November 13, 2024]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Daliah H. Weiss, Judge; L.T. Case No. 50-2021-CF-003511-AXXX-WB.

Carey Haughwout, Public Defender, and Benjamin H. Eisenberg, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Jeanine Germanowicz, Assistant Attorney General, West Palm Beach, for appellee.

DAMOORGIAN, J.

Julio Rocael Aguilar Lopez ("Defendant") appeals his convictions and sentences for two counts of capital sexual battery on a person less than twelve years of age. We affirm on all issues and write only to address Defendant's Confrontation Clause challenge.

On April 24, 2021, police responded to a call regarding a suspected sexual battery on a person less than twelve years of age, namely Defendant's girlfriend's nine-year-old daughter ("the child"). Per the probable cause affidavit, the child reported that Defendant had inserted both his finger and penis in her vagina earlier that day. A subsequent medical exam confirmed the presence of bruising on the child's hymen and dark dried blood consistent with penile penetration. Male DNA was also detected on the vaginal swabs taken from the child. However, the amount recovered was insufficient for comparison testing.

Five days after the sexual battery had been reported to police, a U.S. Marshal located Defendant on a bus in Texas. Defendant was subsequently arrested and transported back to Florida.

Prior to trial, the State moved to permit the U.S. Marshal to testify remotely via Zoom. The motion asserted the U.S. Marshal currently resided and was employed in Galveston, Texas, and was unavailable to testify in-person the week of January 3, 2023. The defense objected to the request, expressing concerns with the legitimacy of the U.S. Marshal identifying Defendant over Zoom and the lack of guarantee that the U.S. Marshal would not be reading directly from his report while testifying. In response, the State filed an additional motion asserting that, in the event the Zoom testimony was not permitted, it intended on flying the U.S. Marshal in from Texas to testify in person during trial on January 9, 2023.

Defendant's jury trial began on Tuesday, January 3, 2023. At the start of trial, the State advised the court that the U.S. Marshal would be available to testify via Zoom all week, but the earliest date he would be available to testify in person would be Monday, January 9, 2023. As the parties estimated the trial would be finished by the end of the week, the State again requested that the U.S. Marshal be permitted to testify via Zoom. The trial court did not initially rule on the request. The trial court did, however, express the desire to finish the trial the week of January 3, 2023, as the trial court was unavailable the following two weeks, and it would not be "ideal" to have the "jury come back in three weeks."

The trial court addressed the issue again later in the trial. When asked about the necessity of the U.S. Marshal's testimony, the State argued he was a "material witness" in that his testimony was needed to demonstrate consciousness of guilt. As some confusion existed regarding the reason for the U.S. Marshal's unavailability, the trial court decided to call the U.S. Marshal in open court. The U.S. Marshal explained that staffing issues at the U.S. Marshals Service prevented him from leaving Texas the week of January 3, 2023. The trial court ultimately allowed the U.S. Marshal to testify via Zoom, reasoning the testimony was "potentially critical and probative" and that staffing issues impacted his "ability to travel."

The U.S. Marshal thereafter testified remotely via Zoom that on April 29, 2021, he had located Defendant on a bus in Texas that was heading southbound approximately an hour and a half driving distance from Mexico. When the U.S. Marshal entered the bus, Defendant was sitting with his head down. After looking at Defendant's bus ticket and comparing his face to a wanted photo, the U.S. Marshal arrested Defendant. The defense declined to cross-examine the U.S. Marshal.

2

Defendant was ultimately found guilty of two counts of capital sexual battery as charged and sentenced to a term of life in prison without the possibility of parole. This appeal follows.

The United States and Florida Constitutions guarantee criminal defendants the right to confront adverse witnesses at trial. *See* U.S. Const. amend. VI.; Art. I, § 16(a), Fla. Const. This right generally entails face-to-face confrontation or "live testimony in court subject to adversarial testing." *State v. Contreras*, 979 So. 2d 896, 908 (Fla. 2008) (quoting *Crawford v. Washington*, 541 U.S. 36, 43 (2004)); *see also Coy v. Iowa*, 487 U.S. 1012, 1016 (1988).

On appeal, Defendant argues the trial court violated his Confrontation Clause rights by permitting the U.S. Marshal to testify remotely via Zoom. Specifically, Defendant argues the justification given for allowing the remote testimony, namely staff shortages and convenience, was legally insufficient to satisfy the necessity analysis.

We agree with Defendant that the trial court's justification for allowing the remote testimony was legally insufficient, particularly in light of the fact that the U.S. Marshal was within the court's subpoena power. *See Slawinski v. State*, 895 So. 2d 483, 484 (Fla. 4th DCA 2005) ("The fact that a witness resides in a state other than Florida does not mean that the witness is beyond the territorial jurisdiction of Florida.").

We are nonetheless compelled to affirm in this case because any error in allowing the U.S. Marshal to testify remotely was harmless. *See Contreras*, 979 So. 2d at 911 ("It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review[.]" (citation omitted)). In addition to the U.S. Marshal's limited testimony that he had located Defendant on a bus in Texas five days after the incident occurred, the State presented compelling evidence that Defendant had sexually battered the child. The child testified at trial that on the day of the incident, while she was alone in the apartment with Defendant, Defendant had put her on a bed, took off her pants, and inserted a finger inside her vagina. Defendant then inserted his penis in her vagina, causing her to bleed. Immediately upon seeing the blood, Defendant stopped and told the child to clean up the blood in the bathroom. The child then went to the bathroom and attempted to stop the bleeding using toilet paper. As the toilet paper was not enough to stop the bleeding, the child testified Defendant gave her a pair of children's leggings to use instead. Police later recovered the bloody toilet paper and leggings, photos of which were shown to the jury. The child's mother also

testified that when she had returned home approximately fifteen minutes after the incident, the child immediately told her what Defendant had done. The doctor who examined the victim at the hospital confirmed that the bruising and dried blood observed on the child's hymen was consistent with penile penetration. Finally, the State presented evidence showing that male DNA was detected on the vaginal swabs taken from the child. Under these circumstances, we hold that the U.S. Marshal's limited testimony, which the defense apparently did not find significant enough to merit cross examination, was harmless.

*Affirmed.*

ARTAU, J., concurs.
FORST, J., concurs in result only.
ARTAU, J., also concurs specially with opinion.

ARTAU, J., concurring specially.

"[T]he Sixth Amendment requires confrontation, and we are not at liberty to ignore it." *Maryland v. Craig*, 497 U.S. 836, 870 (1990) (Scalia, J., dissenting). Thus, "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford v. Washington*, 541 U.S. 36, 69 (2004).

But the defendant here was erroneously not afforded this right, and I write separately to explain why, while also acknowledging that the conviction must be affirmed on harmless error grounds.

The Confrontation Clause "comes to us on faded parchment" and has "a lineage that traces back to the beginnings of Western legal culture[,]" at least as early as the Roman Empire. *Coy v. Iowa*, 487 U.S. 1012, 1015 (1988) (quoting *California v. Green*, 339 U.S. 149, 174 (1970) (Harlan, J., concurring)). As the Roman Governor Festus put it, "It is not the manner of the Romans to deliver any man up to die *before the accused has met his accusers face to face*[.]" *Id.* (emphasis added) (quoting Acts 25:16).

This practice also existed at common law. *See Crawford*, 541 U.S. at 43 ("The common-law tradition [was] one of live testimony in court subject to adversarial testimony[.]" (citing 3 W. Blackstone, Commentaries on the Laws of England 373-74 (1768))). In fact, under "the established rules of the common law," a witness's testimony was admissible only if the witness had testified face-to-face with the defendant because of "the solemnity of the occasion[,]" even "notwithstanding the death of the witness[.]" *Id.* at 49 (quoting *State v. Campbell*, 30 S.C.L. (1 Rich.) 124, 125 (S.C. Ct. App.

4

1844)). The common law did, however, recognize two exceptions to this rule: the statement was admissible without face-to-face confrontation if it either (1) constituted a dying declaration or (2) was made by a witness who was unavailable because of the defendant's wrongful act. *Giles v. California*, 554 U.S. 353, 358-59 (2008); *see also Crawford*, 541 U.S. at 56 n.6 ("If [the dying declaration] exception must be accepted on historical grounds, it is *sui generis*.").

Despite the common law's guarantee of the right of confrontation, the British would, at times, deny a criminal defendant this right and would instead apply the civil law rule. *Crawford*, 541 U.S. at 43. Under the civil law rule, officers of the court would examine the witnesses before trial, and "[t]hese examinations [would be] read in court in lieu of live testimony[.]" *Id.* Perhaps one of the most notable instances of this occurring was the 1603 treason trial of Sir Walter Raleigh. *Id.* at 44.

Prior to this trial, Sir Raleigh's alleged accomplice implicated Sir Raleigh in an examination before the Privy Council and in a letter. *Id.* These statements were then read into evidence at Sir Raleigh's trial. *Id.* Believing that the witness had lied, Sir Raleigh demanded that the witness provide live testimony because that was what the common law required. *Id.* The court, however, refused Sir Raleigh's request, and Sir Raleigh was convicted and sentenced to death. *Id.*

It was later said that "the justice of England has never been so degraded and injured as by the condemnation of Sir Walter Raleigh." *Id.* (quoting 1 D. Jardine, Criminal Trials 520 (1832)). The Framers, when drafting the Confrontation Clause, were aware of the abuses that occurred during Sir Raleigh's trial. *Id.* at 68. In fact, "[i]t was these practices that the Crown deployed in notorious treason cases like Raleigh's[] . . . that the founding-era rhetoric decried." *Id.* at 50. It is "with this focus in mind" that "[t]he Sixth Amendment must be interpreted[.]" *Id.*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"[1] The word "confront" has two Latin roots: (1) "con" and (2) "frons." *Coy*, 487 U.S. at 1015. The prefix "con" is derived from "contra," meaning "against" or "opposed," and the noun "frons" means "forehead." *Id.* Thus, the word "confront" necessarily requires a face-to-face encounter. *Id.*; *see also* Frank R. Hermann & Brownlow M. Speer, *Facing*

---

[1] Article I, section 16(a), of the Florida Constitution also guarantees that "[i]n all criminal prosecutions the accused shall . . . have the right to have compulsory process for witnesses, [and] to confront at trial adverse witnesses[.]"

*the Accuser: Ancient and Medieval Precursors of the Confrontation Clause*, 34 Va. J. Int'l L. 481, 537 (1994) ("[T]he noun confrontation and verb confronter came to be used [in mid-fifteenth century France] to designate the act of physically producing accusing witnesses before a defendant."); *Confront*, Black's Law Dictionary (12th ed. 2024) (The word "confront" means "to put face-to-face with.").

Thus, the Confrontation Clause guarantees that the common law tradition of confrontation applies in all criminal proceedings. *See Crawford*, 541 U.S. at 43 ("The founding generation's immediate source of the [confrontation] concept[] . . . was the common law."); *see also Coy*, 487 U.S. at 1017 (explaining that the "literal right to 'confront' the witness at the time of trial" was at "the core of the values furthered by the Confrontation Clause" (quoting *Green*, 339 U.S. at 157)).

Indeed, because the Confrontation Clause guarantees the right to "confront" witnesses, it has "never [been] doubted[] . . . that the Confrontation Clause guarantees the defendant *a face-to-face meeting* with witnesses appearing before the trier of fact." *Coy*, 487 U.S. at 1015 (emphasis added).

And while "[i]t is true that [the Supreme Court has] in the past indicated that rights conferred by the Confrontation Clause are not absolute[] and may give way to other important interests[,] *[t]he rights referred to in those cases, however, were not the right narrowly and explicitly set forth in the Clause*[.]" *Id.* at 1020 (emphasis added). Instead, these rights were ones "reasonably implicit" within the Confrontation Clause, such as the right to cross-examination, the right to exclude out-of-court statements, and the right to face-to-face confrontation at a proceeding *prior to trial. Id.*

Therefore, the only exceptions to the right to confront guaranteed by the Confrontation Clause are those that the common law recognized. *Crawford*, 541 U.S. at 54; *see also Mattox v. United States*, 156 U.S. 237, 243 (1895) ("We are bound to interpret the constitution in the light of the law as it existed at the time it was adopted[.]").

Despite this, the Supreme Court, in the context of a child witness, carved out an exception to the Confrontation Clause that was not recognized at common law by relying on *Ohio v. Roberts*, 448 U.S. 56 (1980), to conclude "that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *See Craig*, 497 U.S. 836, 850.

However, the Supreme Court later overruled *Roberts* because "[t]he *Roberts* test [incorrectly] allow[ed] a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability." *Crawford*, 541 U.S. at 62. The Court reasoned that the *Roberts* test, which "[d]ispens[ed] with confrontation because testimony [was] obviously reliable[,]" was "akin to dispensing with jury trial because a defendant is obviously guilty." *Id.* Thus, the *Roberts* test "is not what the Sixth Amendment prescribes." *Id.*

In overruling *Roberts*, the Supreme Court, however, did not expressly address *Craig*. *Id.* at 62-69. But, regardless, the effect of overturning *Roberts* was that the Confrontation Clause analysis was restored to its original common law understanding, except in the factual circumstances applicable in *Craig*—where "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Craig*, 497 U.S. at 853; *see also State v. Contreras*, 979 So. 2d 896, 902 (Fla. 2008) (recognizing that "[i]n *Crawford*, the Supreme Court dispensed with the Roberts reliability analysis"); *Faughn v. Commonwealth*, 694 S.W.3d 339, 346 (Ky. 2024) ("We [have] expressed our skepticism as to the continuing validity of the U.S. Supreme Court's opinion in *Maryland v. Craig* in light of the demise of the balancing test set forth in *Ohio v. Roberts*, which served as the analytical foundation of *Craig*.").

Moreover, our Constitution is not a fungible document that can be selectively enforced based on public policy preferences. Certainly, public policy considerations can provide the impetus for a movement to amend our Constitution pursuant to the process established by its Framers, but judges are not at liberty to substitute their personal policy preferences for that of the Framers. *See Crawford*, 541 U.S. at 54 ("The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts. Rather, [it] . . . is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.").

Applied here, the defendant's constitutional right to confront the witnesses against him was violated for the simple fact that the witness testified via Zoom rather than live in the courtroom. Neither of the common law exceptions apply because the witness was not unavailable due to a wrongful act by the defendant and the witness's testimony was certainly not a dying declaration.

In addition, the limited exception recognized in *Craig* is not present here where the witness is an adult, especially when the adult is a U.S. Marshal. Rather, the witness was allowed to testify via Zoom because it was more convenient for the court's schedule. But while "[v]irtual confrontation might be sufficient to protect virtual constitutional rights[,] I doubt whether it is sufficient to protect real ones." *Court Rules*, 207 F.R.D. 89, 94 (2002) (Scalia, J.). The Bill of Rights in our Constitution was most certainly written to protect real individual rights.

Furthermore, the defendant did not waive his rights under the Confrontation Clause.

Under the Confrontation Clause, a "waiver must be knowing[ly], voluntar[ily], and intelligent[ly]" made to be valid. *Contreras*, 979 So. 2d at 909. However, a waiver of the right to cross-examine the witness is not a waiver of the right to confront the witness face-to-face. *See Barber v. Page*, 390 U.S. 719, 725 (1968) ("To suggest that failure to cross-examine [a witness at a preliminary hearing] constitutes a waiver of the right of confrontation at a subsequent trial hardly comports with this Court's definition of a waiver[.]"). This is because the right to confrontation "includes both the opportunity to cross-examine *and* the occasion for the jury to weigh the demeanor of the witness." *Id.* (emphasis added).

Thus, the defendant's choice to not cross-examine the witness did not waive his other Confrontation Clause objections. Instead, he merely waived his cross-examination right under the Confrontation Clause, not his right to face-to-face confrontation.

However, despite this clear Confrontation Clause violation and the issue not being waived, I agree that the defendant's conviction must be affirmed because the error was harmless beyond a reasonable doubt.

The Supreme Court has held that state courts can apply harmless error analysis to federal constitutional violations. *Chapman v. California*, 386 U.S. 18, 22 (1967). It is, however, a matter of state law whether to apply harmless error analysis to these types of error. *See id.* at 24 ("We[] . . . do no more than adhere to the meaning of [*Fahy v. Connecticut*, 375 U.S. 85 (1963)] when we hold[] . . . that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."); *see also Connecticut v. Johnson*, 460 U.S. 73, 88 (1983) (Stevens, J., concurring) ("[F]ederal law does not *require* a state appellate court to make a harmless error determination; it merely *permits* the state court do so in appropriate cases. This is all the

Court held in *Chapman*[.]").

States can apply harmless error analysis to Confrontation Clause violations, including the denial of face-to-face confrontation. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) ("[W]e hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis."); *Coy*, 487 U.S. at 1021 ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, and see no reason why denial of face-to-face confrontation should not be treated the same." (internal citation omitted)).

Our supreme court has held that Confrontation Clause violations are subject to harmless error analysis. *See Contreras*, 979 So. 2d at 911 ("It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review[,] . . . and *Crawford* does not suggest otherwise." (second alteration in original) (quoting *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004))).

Thus, a Confrontation Clause violation is harmless if the State can prove "beyond a reasonable doubt that the error did not affect the verdict[.]" *Id.* (quoting *State v. DiGuilio*, 491 So. 2d 1129, 1139 (Fla. 1986)).

The error here was harmless because the witness's limited testimony related to where the witness found the defendant as the defendant was fleeing and the State presented other overwhelming evidence detailing how the defendant committed the offense. Therefore, while the defendant's constitutional rights were violated by the witness providing virtual testimony, it can be said beyond a reasonable doubt that the error did not contribute to the verdict, and the conviction must accordingly be affirmed. *See* § 59.041, Fla. Stat. (2021) (providing that a judgment cannot be reversed for harmless error that does not result "in a miscarriage of justice").

\*    \*    \*

***Not final until disposition of timely filed motion for rehearing.***